# STATE OF MICHIGAN

# COURT OF APPEALS

In re HICKS/BROWN, Minors.

FOR PUBLICATION
April 26, 2016
9:00 a.m.

No. 328870
Wayne Circuit Court
Family Division
LC No. 12-506605-NA

Before: GLEICHER, P.J., and CAVANAGH and FORT HOOD, JJ.

GLEICHER, P.J.

Respondent-mother is a cognitively impaired young woman. When respondent's family support system fell apart, she relinquished custody of her two-month-old daughter to the Department of Health and Human Services (DHHS). Subsequently, the DHHS took respondent's newborn son into care. Although the child protective proceedings persisted for more than three years and the DHHS was well aware of respondent's special needs, the case service plan never included reasonable accommodations to provide respondent a meaningful opportunity to benefit. Absent such accommodations, the DHHS failed in its statutory duty to make reasonable efforts to reunify the family unit. And absent reasonable efforts, the DHHS lacked clear and convincing evidence to support the statutory grounds cited in the termination petition. We therefore vacate the circuit court's order terminating respondent's parental rights to her two minor children and remand for reconsideration following the provision of necessary accommodated services.

## I. FACTUAL AND PROCEDURAL HISTORY

Psychological testing revealed that respondent has a Full Scale IQ of 70, placing her in the second percentile and borderline range of intellectual functioning. Her Verbal Comprehension index is 66, within the extremely low range. Her scores related to perceptual reasoning, processing speed, and working memory are equally low. Caseworkers commented on the overt appearance of respondent's impairment upon meeting her, as well as noting her difficulty in communicating on the telephone, her shyness and hesitancy, and her flat affect. Child Protective Services (CPS) had been intermittently involved in respondent's life since she was seven years old. Despite this early intervention and respondent's obvious cognitive or developmental impairments, she never received special education services as a child.

Respondent's mother, CB, is also cognitively impaired. For many years, CB's mother lived with CB and her four children to assist in running the household. Following the

-1-

grandmother's death, the family's wellbeing dramatically declined. In November 2011, CPS intervened and removed CB's minor children from her care. At that time, respondent (by then an adult), her boyfriend (AH), and CB's boyfriend, Steven Butler, a registered child sex offender, also lived in the home. Respondent's younger sister accused Butler of rape, but CB did not end their relationship.[1] A CPS worker advised the pregnant respondent that she would be required to make other living arrangements upon her child's birth but provided no services or assistance to the young, disabled mother.

Respondent's daughter, DH, was born on January 29, 2012.[2] CB subsequently threatened to evict respondent and the infant. On April 10, 2012, respondent appeared at the CPS office. She told CPS worker Cordell Huckaby that she was about to be homeless and felt overwhelmed by trying to care for two-month-old DH on her own. Huckaby reported that respondent "displayed abnormal behavior that presented concerns that she may have some untreated mental health issues." Huckaby spent more than four hours with respondent. With CB's help, Huckaby contacted various family members and friends to find housing for respondent and DH. Respondent's grandmother in Cleveland, Ohio offered mother and baby a home, as did a local family friend. Respondent declined both placements, and the DHHS took DH into care on an emergency basis and placed her with a nonrelative.

The circuit court did not adjudicate respondent unfit for another ten months; respondent bore no fault for this dealy. In the meantime, due to a series of CPS and DHHS errors, respondent was denied parenting time. Huckaby was the only official present at the initial child protective hearings. He indicated that parenting time sessions had to be arranged through the DHHS caseworker. However, Huckaby was uncertain of the caseworker's identity. When respondent attempted to contact the DHHS to arrange visits, her messages received no follow up.

In late October 2012, the DHHS finally assigned a caseworker who appeared willing and able to assist respondent. Beth Houle initially had difficulty connecting with respondent, noting that "she was extremely hard to understand when she left messages." Houle arranged for supervised parenting time sessions starting December 12, 2012.

An adjudication trial was finally conducted on January 28, 2013, and Houle created an "Updated Service Plan" for respondent. This plan was actually the first service plan provided. Despite that DH had been in care for 10 months and CPS had been involved with respondent since November 2011, no services had yet been offered. Under the January 2013 case service plan, respondent was required to undergo a psychological evaluation, participate in therapy and parenting classes, visit the child for three hours each week, earn her GED, and find employment and a home. Respondent, pregnant with her second child, was then bouncing between the homes of various relatives.

---

[1] In the proceedings related to CB's parental rights, respondent asserted that Butler had raped her when she was 18 years old.

[2] Shortly after DH's birth, a protective order was entered precluding AH's contact with his daughter, leaving respondent to care for the child alone.

Respondent gave birth to her son, EB, on February 7, 2013. An aunt offered to give respondent and the baby a home but the DHHS deemed the placement inappropriate. Accordingly, the DHHS immediately took EB into care and placed him with his sister. At the preliminary hearing regarding EB's placement, a CPS worker, Jacqueline Baskerville, acknowledged that respondent has "emotional . . . and cognitive . . . issues - - impairments." The February 13, 2013 petition to take EB into care recited, "According to Hutzel Hospital social worker Vernice Muldrew, [respondent] was given a psychiatric evaluation and it was determined that she should reside in an adult foster care home as she will need assistance with her daily care."

Despite the recommendation that respondent be placed in adult foster care, she found herself living in a homeless shelter upon her hospital release. During a February 19, 2013 interview with DHHS work Joseph Emerinini, respondent expressed confusion as to why her children were in care, apparently forgetting that she had requested DH's placement. Emerinini elaborated:

> [Respondent] appears to have some intellectual impairments. [Respondent] has difficulties in making decisions . . . . When leaving voice messages she is hard to understand, slurring words and during one message appeared to be coaxed by someone on what to say. [Respondent] only has completion of 9th grade education and has a hard time understanding simple tasks. [Respondent] . . . was not able to write in complete sentences.

While respondent could read to some extent, Emerinini described her comprehension level as low.

Case notes throughout the report also revealed Houle's concerns about respondent's capacity and abilities. On February 26, 2013, Houle informed respondent's therapist, Shelita Richmond, that respondent "is in need of guidance and understanding of how to be independent and self sufficient[.]" Houle described respondent as "quiet" and as needing specific direction because she would not do anything beyond the instructions given. Houle advised the parenting class coordinator that respondent "appears to have some cognitive delays and does not understand some things presented to her, and things need to be explained to her in simple terms."

The circuit court judge assigned to the matter also seemed to recognize respondent's impairment given the manner in which he spoke to respondent on the record. For example, at the adjudication trial in relation to EB, the court instructed:

> [Respondent], you need to speak up as if you're mad at me so this nice young lady in front of me can prepare a transcript; okay?
>
> And oh, by the way, I only eat attorneys; okay?
>
> * * *
>
> I'm going to ask you to do something that's really very rude. Your attorney is going to ask you questions. Could you answer them facing this nice young lady in front of me so she can prepare a good transcript of this.

-3-

The only time that respondent said anything beyond "yes" or "no" at any proceeding was at that trial. An attorney asked respondent whether she suffered from depression and she indicated, "When I get around people I be mad."

Respondent was not evaluated by a psychologist and psychiatrist for the purposes of the case service plan until May 2013. Before that time, and without benefit of the knowledge of respondent's cognitive abilities, the DHHS referred her for parenting classes and therapy. The agency also referred respondent to Focus Hope for GED preparation classes and employment and job skills training, with no concept of whether she could benefit from those services. Houle did note that the initiation of the various services had to be staggered because "[i]t appears that too much given to [respondent] at a time is overwhelming for her." Houle also secured the appointment of a "parent partner" for respondent. However, that individual never testified at any hearing and the record is devoid of information regarding any assistance that person may have provided.

As noted, testing revealed that respondent had "low cognitive functioning." The psychologist reported that respondent's scores and lack of "insight" revealed that "she may be limited in her ability to independently manage more complex activities of daily living." The psychologist recommended "behavioral therapy that utilizes in-session role-playing to address concerns." The psychologist further opined, "It may be beneficial to administer a measure of adaptive functioning to determine specific strengths and weaknesses with regard to activities of daily living." Neither recommendation was ever implemented.

Instead, for the next two years, the DHHS continued to provide services geared toward a parent of average cognitive functioning.[3] Richmond provided more hands-on assistance during therapy sessions. She actively worked with respondent in her search for employment, Section 8 housing, and Social Security Disability (SSD) income. None of these attempts were fruitful. Houle was sensitive to respondent's needs, but did not seek out specialized wrap-around services designed to assist the cognitively impaired.

The DHHS continued to search for an appropriate relative who could provide housing and parenting assistance to respondent. She moved in with her uncle, his girlfriend, and their children in May 2013, and remained in their home for nearly the entirety of the proceedings. Although respondent's uncle was willing to provide additional assistance to respondent, he was not willing to have the children placed in his home. Respondent's grandmother in Cleveland, Ohio indicated that respondent and the children could be placed with her. However, given her advanced age, the grandmother asserted that respondent would be entirely responsible for the children's care. The DHHS found respondent ill-equipped to handle that responsibility.

The DHHS eventually transitioned respondent's services to Michigan Rehabilitation Center, Northeast Guidance Center, and then Care Link. Although these agencies provide in-

---

[3] Counsel for the DHHS had no objection to extending the case beyond the traditional 15 month period, acknowledging that respondent required additional time to benefit from services given her cognitive impairment.

depth services to the cognitively impaired, respondent was not referred for that type of assistance. Instead, respondent merely continued in parenting classes and therapy through these providers. In the summer of 2014, Yasmin Gibson replaced Houle as the caseworker assigned to the case. After that assignment, respondent's prospects quickly went downhill. Even two months after her assignment, Gibson knew very little about the status of respondent's case. Gibson did not understand the level of respondent's impairment and had made no follow-up with respondent's service providers. She also abruptly discontinued assisting respondent in her bid to secure Section 8 housing and SSD income.

Given the change in DHHS personnel, respondent's attorney, Julie Gilflix, took a more proactive role. She requested that the DHHS transfer respondent's services to the Neighborhood Services Organization (NSO), which would provide intensive services even beyond the child protective proceedings. NSO secures employment opportunities for the cognitively impaired, as well as assistance in "supportive housing," educational support, and parenting classes.[4] Gilflix expressed concern that the DHHS had not provided her client "intense services" and was "not working with her individually" or "looking at her individual needs." Gilflix was dismayed that Gibson assumed respondent could independently find a job when she "need[ed] assistance in reading" and completing the necessary applications. The circuit court dismissed Gilflix's concerns, stating "I really don't think workers should be in the business of taking parents by the hand."

At a November 7, 2014 hearing, Gibson finally indicated that she was investigating the possibility of transferring respondent's services to NSO. For the next six months, Gibson made excuses and blamed the agencies for providing inaccurate information on how to secure the proper type of services for respondent. Finally, at a May 30, 2015 hearing, after which the circuit court ordered the DHHS to file a termination petition, Gibson reported that NSO denied respondent's application for services because the agencies that had been providing services throughout the proceedings could have been providing intensive wrap-around services for the cognitively impaired all along. Apparently neither Gibson nor Houle had ever investigated that possibility or referred respondent for the correct type of services.

On June 18, 2015, more than three years after DH had been taken into care, and despite that the DHHS had never secured services geared toward assisting a cognitively impaired parent, the DHHS filed a supplemental petition seeking termination. The petition cited that respondent had never taken her GED or secured housing or income. The DHHS continued that respondent had not benefited from services to the point she could safely parent her children.

Gibson was the only witness at the termination hearing. The DHHS did not call any service providers or respondent's therapist. The department presented absolutely no evidence, beyond Gibson's assertions, regarding whether specialized services would have assisted respondent in safely parenting her children. By the time of the termination hearing, respondent had moved in with her grandmother in Cleveland. Accordingly, Gibson opined that further

---

[4] See Neighborhood Service Organization, <http://www.nso-mi.org/index.php> accessed April 18, 2016).

services would be impossible. In closing argument, Gilflix challenged Gibson's claims, noting that "reasonable efforts have not been made" and that respondent's residence in Cleveland was not permanent. Despite these pleas, the circuit court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*) (grounds leading to adjudication have not been remedied and cannot be remedied within a reasonable time) and (g) (failure to provide proper care and custody).

## II. LEGAL BACKGROUND

Parents have a "fundamental liberty interest . . . in the care, custody, and management of their child[ren]," a right that "does not evaporate simply because they have not been model parents." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). In Michigan, a court may terminate a person's parental rights when clear and convincing evidence supports at least one ground elucidated in MCL 712A.19b(3). Before the court may consider termination, however, the DHHS must exert "reasonable efforts" to maintain the child in her or her parents' care, MCL 712A.18f(1), (4), and make "reasonable efforts to reunite the child and family." MCL 712A.19a(2).[5] Reasonable efforts at reunification are made through a case service plan. See *In re Mason*, 486 Mich 142, 156; 782 NW2d 747 (2010); MCL 712A.18f(3). The need to make "reasonable efforts" stems from federal law. Pursuant to 45 CFR 1356.21(b), to remain eligible for foster care maintenance payments under Title IV-E, state agencies "must make reasonable efforts to maintain the family unit."

The reasonableness of the efforts provided affects the sufficiency of the evidence supporting the grounds for termination. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005). However, neither the federal nor the state statutes define the "reasonable efforts" necessary to reunify or maintain the family unit. We know from our Supreme Court's differentiation of "reasonable" from "active" efforts under the Indian Child Welfare Act that "reasonable efforts" include a DHHS worker "making a referral for services and attempt[ing] to engage the family in services." *In re JL*, 483 Mich 300, 322 n 15; 770 NW2d 853 (2009). Our courts have not expressly defined the parameters of necessary services.

This system is complicated when the parent involved in a child protective proceeding suffers from some type of disability. According to *Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children*, National Council on Disability (September 27, 2012), p 90: "Systematic discrimination by state courts, child welfare agencies, and legislatures against parents with disabilities and their families" have led to the removal of children from the care of disabled parents "with alarming frequency."[6] Parents with intellectual and psychiatric

---

[5] The statute provides that reasonable reunification efforts are not required in limited circumstances, such as where the parent has been convicted in the killing or serious injury of the child's sibling, has had his or her parental rights terminated to the child's sibling, is a registered sex offender, or if aggravated circumstances exist under MCL 722.638(1) or (2). MCL 712A.19a(2).

[6] Available at <https://www.ncd.gov/publications/2012/Sep272012/Ch13> (accessed April 18, 2016).

disabilities face the steepest obstacles, experiencing discrimination based on stereotyping, "lack of individualized assessments," and the failure to provide the types of services needed for the individual to benefit. *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts Under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act*, U.S. Department of Health and Human Services and Department of Justice, p 2.[7]  This discrimination is not new and has previously been approved by our country's highest court.  In *Buck v Bell*, 274 US 200, 207; 71 L Ed 1000 (1927), Justice Oliver Wendell Holmes, Jr. lauded forced sterilization of the mentally incompetent "who are manifestly unfit [to] continu[e] their kind."  As a result of institutional discrimination, parents with intellectual disabilities "lose[] children at a rate of 40 percent to 80 percent." *Rocking the Cradle*, p 263.  And termination is often based on the fact that the parent does "not receive services that address the effects of their disability on parenting." *Termination of Parental Rights of Parents with Mental Disabilities*, Judge David L. Bazelon Center for Mental Health Law, p 2.[8]

When a disabled parent is a party to child protective proceedings, Section 504 of the Rehabilitation Act of 1973, 29 USC 794, and Title II of the Americans with Disabilities Act of 1990 (ADA), 42 USC 12131 *et seq.*, control the nature of the services that must be provided. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC 12132.  Section 504 of the Rehabilitation Act similarly provides that qualified disabled persons shall not "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" "solely by reason of her or his disability."  29 USC 794(a).  In adopting these acts, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *School Bd of Nassau Co, Fl v Arline*, 480 US 273, 284; 107 S Ct 1123; 94 L Ed 2d 307 (1987).

As stated by this Court in *In re Terry*, 240 Mich App 14, 25-26; 610 NW2d 563 (2000):

> [T]he ADA . . . require[s] a public agency, such as the Family Independence Agency (FIA), *to make reasonable accommodations* for those individuals with disabilities so that all persons may receive the benefits of public programs and services.  Thus, the reunification services and programs provided by the FIA must comply with the ADA. . . . [W]e discern no conflict between the ADA and Michigan's Juvenile Code.  Under MCL 712A.18f(4), before entering an order of disposition, the court must determine whether the FIA has made "reasonable efforts" to rectify the conditions that led to its involvement in the

---

[7]   Available at <http://www.ada.gov/doj_hhs_ta/child_welfare_ta.html> (accessed April 18, 2016).

[8]   Available at <http://www.peapods.us/UserFiles/File/Termination%20of%20Parental%20Rights%20of%20Parents%20with%20Mental%20Disabilities.pdf> (accessed April 18, 2016).

case. Thus, the state legislative requirement that the FIA make reasonable efforts to reunite a family is consistent with the ADA's directive that disabilities be reasonably accommodated. In other words, *if the FIA fails to take into account the parents' limitations or disabilities and make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family.* [Emphasis added.]

The federal Departments of Health and Human Services and Justice have described, "Two principles that are fundamental to Title II of the ADA and Section 504 are: (1) individualized treatment; and (2) full and equal opportunity." *Protecting the Rights of Parents and Prospective Parents with Disabilities*, p 4. In this vein, 28 CFR 35.130(b) provides:

(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability --

     (*i*) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

     (*ii*) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

     (*iii*) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

     (*iv*) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

* * *

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

* * *

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

45 CFR 84.4 provides substantively identical protection to "qualified handicapped" individuals.

> Taken together, [the various provisions of 28 CFR 35.130(b), and by extension 45 CFR 84.4,] are intended to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities. Consistent with these standards, public entities are required to ensure that their actions are based on facts applicable to individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do. [28 CFR Part 35, Appendix B, § 35.130.]

## III. PRESERVATION

Before we reach the substance of this case, we must resolve whether respondent preserved her challenge to the level of services provided.

As discussed in *Terry*, 240 Mich App at 26:

> Any claim that the FIA is violating the ADA must be raised in a timely manner . . . so that any reasonable accommodations can be made. Accordingly, if a parent believes that the FIA is unreasonably refusing to accommodate a disability, the parent should claim a violation of her rights under the ADA, *either when a service plan is adopted or soon afterward*. The court may then address the parent's claim under the ADA. Where a disabled person fails to make a timely claim that the services provided are inadequate to her particular needs, she may not argue that petitioner failed to comply with the ADA at a dispositional hearing regarding whether to terminate her parental rights. In such a case, her sole remedy is to commence a separate action for discrimination under the ADA. At the dispositional hearing, the family court's task is to determine, as a question of fact, whether petitioner made reasonable efforts to reunite the family, without reference to the ADA.[5]

---

5 Any claim that the parent's rights under the ADA were violated *must be raised well before a dispositional hearing regarding whether to terminate her parental rights*, and the failure to timely raise the issue *constitutes a waiver*. The focus at the dispositional hearing must be on the parent's rights to the child and the best interests of the child under the Juvenile Code, and the parties and the court should not allow themselves to be distracted by arguments regarding the parent's rights under the ADA. Given that the court must consider whether reasonable efforts were made to reunite the family, precluding specific reference to the ADA at the dispositional hearing is not likely to make any difference in terms of the outcome. [Emphasis added.]

---

Gilflix did not raise an ADA challenge at the time the case service plan was adopted. Neither did she wait until the termination hearing. On January 15, 2014, Gilflix inquired whether the DHHS could provide "one-on-one parenting help" for respondent and caseworker Houle promised to investigate this option. Gilflix specifically expressed concern that the DHHS was not providing the type of services necessary to accommodate her client's disability on August 13, 2014, and continuously repeated her concerns thereafter. Gilflix requested that respondent receive specialized services for the developmentally disabled, the court ordered such services, and caseworker Gibson engaged in a series of errors ensuring that the services were never provided. The DHHS did not file its supplemental petition seeking termination until 10 months after Gilflix's specific request for ADA-compliant services. The termination hearing took place on July 27, 2015, nearly a year after Gilflix first expressed her concern. Given the length of time between Gilflix's objection and the termination proceedings, respondent's challenges are not waived under *Terry*.[9]

We note, however, that experts have challenged the legitimacy of requiring parents to raise an ADA defense so long before the termination hearing. "[F]amily court cases do not always proceed . . . smoothly," and the need to file an objection may not be apparent until later in the proceedings. Cecka, *No Chance to Prove Themselves: The Rights of Mentally Disabled Parents Under the Americans with Disabilities Act and State Law*, 15 Va J Soc Pol'y & L 112, 126 (2007). The court might order reasonable accommodation in services, but the DHHS's failure to provide such accommodations may not immediately leap to counsel's attention. *Id.* at 128. Moreover, the introduction of waiver principles is misplaced because a parent who raises such an objection "is not attempting to litigate the violation in family court;" rather, the parent is challenging the evidentiary support for the termination. *Id.* at 125.

## IV. REASONABLE ACCOMMODATIONS

We now turn to the question of how reasonable accommodations are made in child protective proceedings. The DHHS directs that its workers "must recognize the individuality of all clients and their needs, as well as the extent of their capacities for self-determination" and "tailor[]" services "to meet each client's needs and to recognize the unique aspects of each case." *Services General Requirements Manual*, SRM 101, p 2.[10] The DHHS gives its workers "examples of reasonable efforts," including emergency caretakers, daycare and homemaker services, counseling, emergency shelter and financial assistance, parenting classes, self-help groups, mental health and substance abuse services, "home-based family services," and

---

[9] Respondent also argues that her trial counsel was ineffective in failing to raise her ADA challenge earlier in the proceedings. As we conclude that counsel did not waive review of this issue, we need not consider this claim.

[10] The February 1, 2013 version of this section is available at <http://www.mfia.state.mi.us/OLMWEB/EX/SR/Public/SRM/101.pdf#pagemode=bookmarks> (accessed April 18, 2016).

vocational training. *Children's Foster Care Manual*, FOM 722-06, pp 10-11.[11]  The DHHS acknowledges, "It is only when timely and intensive services are provided to families that agencies and courts can make informed decisions about a parent's ability to protect and care for his/her children." *Id.* at 15.  The lack of investigation and services leaves "a 'hole' in the evidence" upon which the circuit court must base its ultimate decision. *In re Rood*, 483 Mich 73, 127; 763 NW2d 587 (2009) (YOUNG, J.).

The *Children's Foster Care Manual*'s section on "special accommodations" makes no specific mention of how to assist mentally, developmentally, or cognitively disabled parents, giving individualized attention only to accommodations for the deaf and non-English speakers. FOM 722-06F.[12]  Nationwide, "[l]ittle focus has been directed at providing parenting support and services as part of general support for people with intellectual disabilities . . . ." *Rocking the Cradle*, p 263.  In "most jurisdictions," reunification services "often do not address the parent's disability fully."  Smith, *Fit Through Unfairness: The Termination of Parental Rights Due to a Parent's Mental Challenges*, 5 Charlotte L Rev 377, 401 (2014).  Not having standards or a specialized protocol to deal with cognitively impaired parents creates a serious challenge for courts and caseworkers given that, as in this case, "[s]ocial workers are apt to have little or no training or experience in teaching mentally retarded adults; worse, research indicates that many may have no interest in the subject."  Hayman, *Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent*, 103 Harv L Rev 1202, 1224 (1990).

Several government and scholarly sources are helpful in defining the types of reasonable accommodations that nevertheless must be made.  The focal point of any reasonable accommodation analysis must be whether the services were individualized.  Persons with intellectual disabilities "are markedly diverse as a group." *Id.* at 1213.  Their conditions arise from different sources, they exhibit various symptoms, and they operate at varying levels of competence. *Id.* at 1213-1215.  Accordingly, "[i]ndividuals with disabilities must be treated on a case-by-case basis consistent with facts and objective evidence." *Protecting the Rights of Parents and Prospective Parents with Disabilities*, p 4.  The bar for reunification need not be lowered; rather "services must be adapted to meet the needs of a parent . . . who has a disability to provide meaningful and equal access to the benefit." *Id.* at 5.

Another common theme is that of interdependence, rather than forcing a parent to demonstrate the ability to independently parent a child.  As noted in *Presumptions of the Law*, 103 Harv L Rev at 1253, "The law's insistence that the mentally retarded parent be measured 'standing alone' . . . fails to take seriously the social experience of many mentally retarded persons."  Those with intellectual disabilities are often socialized to depend on family, peers, and

---

[11]  The February 1, 2014 version of this section is available at <http://dhhs.michigan.gov/OLMWEB/EX/FO/Public/FOM/722-06.pdf#pagemode=bookmarks> (accessed April 18, 2016).

[12]  The May 1, 2015 version of this section is available at <http://dhhs.michigan.gov/OLMWEB/EX/FO/Public/FOM/722-06F.pdf#          pagemode= bookmarks> (accessed April 18, 2016).

service providers to achieve maximum success. *Id.* at 1253-1254; *Fit Through Unfairness*, 5 Charlotte L Rev at 387-388. In this vein, "[s]uccessful intervention strategies for mentally retarded parents might include foster placements of both parent and child, group homes, temporary live-in training programs, and parent-child daycare centers." *Presumptions of the Law*, 103 Harv L Rev at 1256.

Experts also recommend the use of agencies and service providers experienced in dealing with persons with intellectual disabilities. Specialized agencies provide complete life training services, the benefits of which spill over into the child protective proceedings. Accordingly, the DHHS could coordinate reunification services with such providers. *Protecting the Rights of Parents and Prospective Parents with Disabilities*, pp 15-16; Watkins, *Beyond Status: The Americans with Disabilities Act and the Parental Rights of People Labeled Developmentally Disabled or Mentally Retarded*, 83 Cal L Rev 1415, 1474 (1995). Specially trained personnel available at these agencies understand that goals must be defined "in terms of concrete tasks" that are easier to "comprehend and master." *Presumptions of the Law*, 103 Harv L Rev at 1234. They recognize that instructions must be simplified, and that visual aids, "repetition, routine, and feedback" are vital. Kerr, *The Application of the Americans with Disabilities Act to the Termination of the Parental Rights of Individuals with Mental Disabilities*, 16 J of Contemp Health L & Pol'y 387, 424-425 (2000). The education and experience of the workers will also limit the extent to which parents with an intellectual disability are "judged against conventional norms for behavior." *Presumptions of the Law*, 103 Harv L Rev at 1228. As noted by Hayman, for the untrained, "inarticulateness is perceived as stubbornness or stupidity; shyness or uncertainty, as indifference; and fear and insecurity, as aggression." *Id.*

The concept of giving disabled parents additional time to benefit from services is also of import. State and federal law generally requires the responsible agency to seek termination of a parent's rights if the child has been in foster care for 15 out of the previous 22 months. MCL 712A.19a(6); 42 USC 675(5)(E); 45 CFR 1356.21(i). Under Michigan law, the state may delay in filing a termination petition when "[c]ompelling reasons" exist or when the DHHS has not provided the family "with the services the state considers necessary." MCL 712A.19a(b)(b), (c). These "time lines are often challenging—if not impossible—to comply with" for parents with certain disabilities. *Rocking the Cradle*, p 103. Parents with intellectual disabilities require the opportunity to make "steady but slow progress." *Id.* Using the exceptions in the federal and state statutes supports the needs of the parent without compromising the needs of the child. *Protecting the Rights of Parents and Prospective Parents with Disabilities*, p 14.

Michigan caselaw is sparse regarding the level of services necessary to reasonably accommodate a disabled parent. *In re Newman*, 189 Mich App 61; 472 NW2d 38 (1991), exemplifies our cases involving the *absence* of reasonable efforts. There, the children were taken into care based on unsafe and filthy conditions in the home. *Id.* at 63. The state assigned an aide to assist the cognitively impaired mother in learning how to maintain a clean home. *Id.* at 66. The DHHS's predecessor knew when the aide was assigned that the mother "because of her limited intellectual capacity, need[ed] hands-on instruction, most probably repeatedly." *Id.* The aide purchased cleaning supplies for the mother but "stopped going into the house because it was so dirty." *Id.* As noted by this Court:

This was the person who was supposed to help respondents remedy this problem, but she refused. How then can we say there is no reasonable likelihood that the conditions in the home would not be rectified within a reasonable time when the one person who could have helped respondents remedy the conditions refused to do so? [*Id.*]

*In re Boursaw*, 239 Mich App 161; 607 NW2d 408 (1999), concerned a mother suffering from mental illness. She was provided intensive mental health services throughout the proceedings and her therapist opined that with additional time, she might be able to safely parent her child. This Court found the lower court's termination decision "premature" as the evidence supported that the mother may be able to parent her child within a reasonable time. *Id.* at 177. *Boursaw* implies that psychiatric treatment may require time beyond the normal statutory limits of a child protective proceeding and that a parent's rights cannot be arbitrarily terminated at the end of a set period.

*Terry*, 240 Mich App at 16, involved a "developmentally disabled" mother. The mother sought out services from "the Developmental Disabilities program at Genesee County Community Mental Health," which coordinated its services with those provided in the child protective proceedings. *Id.* at 17. As in this case, the respondent experienced difficulty "in following through with tasks such as finding housing." *Id.* She lacked positive parenting role models as she had been abused as a child. *Id.* The respondent's therapist believed she could attain "basic parenting skills" with "an additional two to three years" of training, "but that she would always need assistance during difficult or stressful periods." *Id.* The caseworker opined that the "[r]espondent needed someone to live with her, not just oversee her progress." *Id.* at 18-19. Unfortunately, the respondent had no friends or family who could provide that support. *Id.* at 19.

Although this Court deemed waived the respondent's challenge to the level of services provided in *Terry*, *id.* at 27, the panel noted that it would have rejected her claims in any event.

It is undisputed that respondent was provided with extensive services, and there is no evidence that she was denied any services that are available to parents with greater cognitive abilities. The caseworkers were aware of respondent's intellectual limitations and would repeat instructions multiple times and remind her when tasks had to be completed. Respondent received assistance through GCCMH to address both personal and parenting problems in a program that was tailored to developmentally disabled persons. An arrangement under which respondent lived in the children's foster home was attempted but proved unsuccessful. Petitioner had no other services available that would address respondent's deficiencies while allowing her to keep her children. The ADA does not require petitioner to provide respondent with full-time, live-in assistance with her children. See *Bartell v Lohiser*, 12 F Supp 2d 640, 650 (ED Mich, 1998). [*Id.* at 27-28.]

A handful of unpublished opinions of this Court have also addressed whether reasonable accommodations were made in providing services to a disabled parent.[13] In *In re Rice*, unpublished opinion per curiam of the Court of Appeals, issued November 12, 2013 (Docket No. 315766), unpub op at 2, this Court found reasonable accommodations where a psychologist evaluated the respondent and recommended tailored services, each service provider was notified regarding the respondent's special needs, and the providers expressly indicated that they modified their services for the respondent, with "methods such as repetition and role modeling."

This Court also found that reasonable accommodations were made in *In re Ali-Maliki*, unpublished opinion per curiam of the Court of Appeals, issued February 19, 2015 (Docket No. 321420). In that case, the DHHS provided services to the cognitively impaired mother for more than four years. *Id.*, unpub op at 2-3. These services included "individual therapy, parenting classes, two evaluations at the Clinic for Child Studies, two psychological evaluations, a psychiatric evaluation, supervised visitations, family therapy, Wraparound services, a parenting coach, and a parent partner. She also received services from an infant mental health specialist." *Id.*, unpub op at 3. The respondent was given the opportunity to parent her children while living with her parents who provided assistance, but even that proved too much. *Id.*, unpub op at 1. This Court ultimately agreed with the circuit court's assessment that reasonable efforts had been made, but that "the evidence amply demonstrates that respondent's limited cognitive abilities could not be accommodated to the degree necessary to enable her to parent the five children, four of whom have severe special needs." *Id.*, unpub op at 4.

In *In re White*, unpublished opinion per curiam of the Court of Appeals, issued March 29, 2012 (Docket No. 305411), unpub op at 2, the developmentally disabled and cognitively impaired mother ceded custody of her children to CPS in part "because she was overwhelmed." The record demonstrated that the respondent starting receiving services "long before the children were removed." *Id.*, unpub op at 4. And during the proceedings, the DHHS "provided respondent with family-reunification services to correct her parenting skills and coping deficits; she received psychological evaluations, parent-child bond evaluations, in-home parent classes, in-home parent coaching from an infant mental-health specialist, in-home community-living support services for home management, and supervised parenting time." *Id.*, unpub op at 2-3. These services were modified to accommodate the respondent's special needs. "She received hands-on demonstrations and proctoring that were consistent with the evaluating psychologist's recommendations." *Id.*, unpub op at 4. As the respondent had not benefitted from the extended, intensive services, this Court affirmed the circuit court's termination decision.

In another case, however, this Court found termination supported when "it became apparent that there were no services available that could help respondent-appellant parent his children because he was not capable of attaining the requisite level of parenting skills needed to parent the children." *In re Pomaville*, unpublished opinion per curiam of the Court of Appeals,

---

[13] Unpublished Court of Appeals opinions are not binding, but may be considered persuasive or instructive. *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010).

issued January 13, 2004 (Docket No. 247168), unpub op at 2. The respondent-father in that case was categorized as "developmentally delayed," had an IQ of 54, and could not read. *Id.* The state "accounted for and reasonably accommodated respondent-appellant's disability in its efforts to reunify the family by locating parenting classes to accommodate his reading disability, attempting to locate services that would enable respondent to parent his children and referring him to two doctors to evaluate his ability to parent with his disability." *Id.* Where the parent cannot benefit even from modified services, however, termination is in the best interests of the children, this Court determined. *Id.*

Michigan jurisprudence has thereby recognized that reasonable accommodations must be tailored to the individual, to meaningfully that person in benefitting from services. Our courts have implied that a cognitively impaired parent could maintain custody of his or her child even if he or she requires assistance from a family member to safely care for the child but has not gone so far as to require the DHHS to consider an assistive housing arrangement such as parenting in a group home or a parent-child foster placement. This Court has recognized the benefit of the DHHS coordinating child protective services with organizations that serve the disabled community. And this Court has cited with approval lower court decisions to delay the initiation of termination proceedings when a disabled parent requires additional time to benefit from services because of their disability.

Given the dearth of Michigan caselaw on point, we also reviewed the jurisprudence of our sister states. We found instructive to our current analysis *In re Victoria M*, 207 Cal App 3d 1317; 255 Cal Rptr 498 (1989). The respondent-mother in that matter had an IQ of 72, placing her "in the borderline range of intelligence." *Id.* at 1321-1322. She had taken special education classes as a child and as an adult, "used social services agencies in the community extensively." *Id.* The county department of social services (DSS) took the mother's three children into care because the family was chronically homeless and the children were underfed, filthy, and infested with lice. *Id.* at 1322. Despite that the mother had "obvious handicaps," *id.* at 1328, and that the DSS had intervened with the family in the past, *id.* at 1327, the DSS waited 16 months to provide psychological testing to assess the mother's level of intellectual functioning. *Id.* at 1324. In the meantime, the mother was referred for generalized services and those providers questioned whether the mother could benefit given her obvious limitations. *Id.* at 1323-1324. The DSS was aware that specialized services for the developmentally disabled were available; it referred the mother's son for such services at Valley Mountain Regional Center (VMRC). *Id.* at 1323-1324 and n 4. The mother eventually secured services for herself through VMRC, but the DSS failed to monitor her progress or coordinate with the agency. *Id.* at 1324, 1330. Of great concern, the DSS also provided little to no assistance in the very areas that brought the children into care. Her parenting class coordinator failed to address "health and hygiene concerns" with mother, incorrectly believing that she understood these concepts. *Id.* at 1328. And despite mother's homelessness and extremely low income, the caseworker simply directed her to a local housing authority and told her to read the newspaper to find housing. *Id.*

The California Court of Appeals found "[t]he record . . . clear that no accommodation was made for [the mother's] special needs in providing reunification services." *Id.* at 1329. The court continued that the mother "obviously is developmentally disabled" and "[h]er disability should have been apparent to those assessing the suitability of services offered to her." *Id.* The caseworker had already referred one of the children to VMRC, a "[r]egional center[] . . .

specifically designed to provide services to persons such as" the mother, but took no steps to secure similar assistance for her. *Id.* at 1329-1330. Given the insufficiency of the services provided, termination could not be supported by clear and convincing evidence on the ground that the mother had not benefitted from services. *Id.* We find *In re Victoria M* virtually indistinguishable from the case at bar, and adopt its reasoning.

Drawing from the caselaw, federal and state law and regulations, and the plethora of expert opinions on the topic, we take this opportunity to clarify what a court and the DHHS must do when faced with a parent with *a known or suspected* intellectual, cognitive, or developmental impairment. In such situations, neither the court nor the DHHS may sit back and wait for the parent to assert his or her right to reasonable accommodations. Rather, the DHHS must offer evaluations to determine the nature and extent of the parent's disability and to secure recommendations for tailoring necessary reunification services to the individual. The DHHS must then endeavor to locate agencies that can provide services geared toward assisting the parent to overcome obstacles to reunification. If no local agency catering to the needs of such individuals exists, the DHHS must ensure that the available service providers modify or adjust their programs to allow the parent an opportunity to benefit equal to that of a nondisabled parent. If it becomes clear that the parent will only be able to safely care for his or her children in a supportive environment, the DHHS must search for potential relatives or friends willing and able to provide a home for all. And if the DHHS shirks these duties, the circuit court must order compliance. Moreover, consistent with MCL 712A.19a(6), if there is a delay in providing the parent reasonably accommodated services or if the evidence supports that the parent could safely care for his or her children within a reasonable time given a reasonable extension of the services period, the court would not be required to order the filing of a termination period merely because the child has been in foster care for 15 out of the last 22 months.

We emphasize that these requirements are not intended to stymie child protective proceedings to the detriment of the children involved. However, "[t]he goal of reunification of the family must not be lost in the laudable attempt to make sure that children are not languishing in foster care while termination proceedings drag on and on." *Boursaw*, 239 Mich App at 176-177. In the event that reasonable accommodations are made but the parent fails to demonstrate sufficient benefit such that he or she can safely parent the child, then the court may proceed to termination. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012); *In re Gazella*, 264 Mich App 668, 676; 692 NW2d 708 (2005). If honest and careful evaluation reveals that no level or type of services could possibly remediate the parent to the point he or she could safely care for the child, termination need not be unnecessarily delayed. Yet, such assessment may not be based on stereotypes or assumptions or an unwillingness to make the required effort to accommodate the parent's needs.

## V. APPLICATION TO THE CURRENT CASE

The DHHS did not fulfill its duties in this case, and the circuit court failed to adequately recognize that shortcoming. The DHHS should have suspected (and likely knew) before the onset of these child protective proceedings that respondent is cognitively impaired. Houle, Baskerville, and Emerinini noted respondent's disability upon first meeting her. Huckaby did not describe respondent as cognitively impaired, but believed she at least suffered from mental illness. As respondent's compromised intellectual abilities were readily apparent, the DHHS

workers involved in CB's child protective proceedings were on notice by November 2011 that respondent required assistance. And no worker involved in the current proceedings has denied the obvious nature of respondent's condition.

Instead of acting post haste to secure psychological and psychiatric evaluations to determine whether reasonably accommodated services were necessary or offered potential benefit, the DHHS waited until May 2013—13 months after DH came into care—to secure these evaluations. In the meantime, the DHHS failed to make adequate efforts to provide respondent with parenting time, effectively denying her contact with her daughter for eight months.

Further, the DHHS failed to reconsider respondent's service plan after respondent was psychologically evaluated. The results of respondent's psychological evaluation were grim, revealing that respondent fell into the low and extremely low range on various assessments. She could read but lacked comprehension of the material perused and could not write in complete sentences. Yet, the DHHS ordered respondent to earn a GED and find employment and housing, and never revisited these mechanically-generated requirements. The psychologist recommended "administer[ing] a measure of adaptive functioning to determine specific strengths and weaknesses with regard to activities of daily living."[14] This was never done. The result was that the DHHS ordered respondent to climb mountains that she could not possibly surmount. Specifically, respondent likely will never be able to read and comprehend the contents of a GED exam, hold down employment without an onsite mentor, or live independently. A service plan that ignored these realities was simply unreasonable and not individually tailored to the parent's needs.

Following the evaluations, the DHHS failed to consider whether respondent required specialized services for the cognitively impaired. The record establishes that several agencies provide wrap-around services for the cognitively impaired in the metropolitan Detroit area. Respondent was even referred for generalized services at some of those agencies. Yet, the DHHS did not seek to have respondent placed in any of the programs geared toward the cognitively impaired until several months after Gilflix objected in August 2014. The DHHS then delayed referring respondent for the proper type of services until the very eve of the termination hearing. Its employee made a half-hearted attempt to transfer respondent's services to the agency respondent's counsel recommended, failed to follow up in a timely manner, and ultimately denied respondent the type of services she required for several months. Although Houle informed the regular service providers that respondent was cognitively impaired and

---

[14] "Adaptive functioning" is "the relative ability of a person to effectively interact with society on all levels and care for one's self; affected by one's willingness to practice skills and pursue opportunities for improvement on all levels. Often used to describe levels of mental retardation." <http://medical-dictionary.thefreedictionary.com/adaptive+functioning> (accessed April 18, 2016). "Tests of adaptive functioning evaluate the social and emotional maturity of a child, relative to his or her peers. They also help to evaluate life skills and abilities." Reynolds, Zupanick, & Dombeck, *Tests of Adaptive Functioning*, <https://www.mentalhelp.net/articles/tests-of-adaptive-functioning/> (accessed April 18, 2016).

required explicit and simple instruction, this was inadequate when more intensive services from specialized agencies were readily available.

The record is also devoid of information regarding the content of the parenting classes, job training, and GED preparation courses in which respondent participated. The psychologist noted that respondent required "in-session role-playing" to address concerns. Respondent also had difficulty reading and comprehending written material. The DHHS presented no witnesses from any service provider to describe how material was presented to respondent. Accordingly, we cannot know whether the limited accommodations recommended by the DHHS were even implemented in practice. And while the caseworkers testified that respondent's therapist provided a higher level of hands-on services to assist respondent in meeting her goals, that therapist was never presented to describe her role or respondent's progress. The DHHS also failed to present the parent partner who was apparently assigned to offer more in-depth assistance, and made no record of his particular services.

Certain evidence suggested that respondent may never achieve the ability to safely parent her children independently. As a result, the DHHS actively searched for a friend or family member to take in both mother and children and provide assistance with childcare. Respondent's grandmother in Ohio offered the family a home, but only if respondent was solely responsible for the children's care. The DHHS deemed this an inappropriate placement. However, the record is devoid of information regarding whether local services would be available to respondent in Ohio so that she could safely parent her children in her grandmother's home with some outside assistance.

Ultimately, respondent may be unable to overcome the conditions that brought her children into care. We readily acknowledge that even with appropriate assistive services she may be unable to safely parent her children. Investigation may reveal that no home is available to respondent where she may provide for her children without, or even with, outside assistance. Given the inadequate reunification services provided thus far, however, any such conclusion is premature. Accordingly, we must vacate the termination decision and remand for the provision of services with reasonable accommodation made for respondent's cognitive impairment.

We vacate the termination decision and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Elizabeth L. Gleicher
/s/ Mark J. Cavanagh
/s/ Karen M. Fort Hood

-18-