# STATE OF MICHIGAN

# COURT OF APPEALS

In re C. APPLEWHIATE, JR., Minor.

UNPUBLISHED
June 6, 2017

No. 335631
Berrien Circuit Court
Family Division
LC No. 2016-000096-NA

Before: MARKEY, P.J., and MURPHY and METER, JJ.

PER CURIAM.

Respondent mother appeals by right the trial court's order terminating her parental rights under MCL 712A.19b(3)(g) (failure to provide proper care and custody), (i) (parent's rights terminated to child's siblings due to serious and chronic neglect), and (j) (reasonable likelihood of harm to child if child is returned to parent). We affirm.

On appeal, mother first argues that the trial court reversibly erred when it failed to comply with the Indian Child Welfare Act (ICWA). We disagree. Because mother failed to preserve this issue, our review is limited to plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "To avoid forfeiture under the plain-error rule, three requirements must be met: (1) an error must have occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (citation and quotation marks omitted). An error is deemed to affect substantial rights if it affected the outcome of the proceedings. *In re Utrera*, 281 Mich App at 9.

In child protective proceedings, an "Indian child" is afforded certain protections under the ICWA and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq. In re Morris*, 491 Mich 81, 98-99; 815 NW2d 62 (2012); *In re Spears*, 309 Mich App 658, 669; 872 NW2d 852 (2015). An "Indian child" is defined by the ICWA as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 USC 1903(4).[1] "[W]hen there are sufficient indications that the child may be an Indian child, the ultimate

---

[1] MIFPA defines "Indian child" similarly to the ICWA, "but does not require the child who is eligible for membership to also be the biological child of a member of an Indian tribe." *In re KMN*, 309 Mich App 274, 287; 870 NW2d 75 (2015); see also MCL 712B.3(k)(*ii*).

determination requires that the tribe receive notice of the child custody proceedings, so that the tribe may advise the court of the child's membership status." *In re Morris*, 491 Mich at 100. The notice provision of the ICWA states in relevant part as follows:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. [25 USC 1912(a); see also MCL 712B.9(1)[2] (the corresponding notice provision in MIFPA).]

The ICWA notice requirement is "triggered by indicia of Indian heritage sufficient to give the court actual knowledge or a 'reason to know' that the child is an Indian child." *In re Morris*, 491 Mich at 104.

Yet regardless whether the ICWA notice requirement is triggered, a trial court is required to "inquire if the child or either parent is a member of an Indian tribe" at the preliminary hearing in a child protective proceeding. MCR 3.965(B)(2). In this case, at no point during mother's preliminary hearing did the trial court make this inquiry. This error is even more palpable given the trial court's involvement in mother's prior termination. In the previous case, mother received services on behalf of the Pokagon Band of Pottawatomi Indians because of her other child's eligibility as a member of that tribe. Given that the trial court had actual knowledge that mother had a different child that qualified as an Indian child, see 25 USC 1903(4), we find that the trial court plainly erred by not inquiring whether the child or either parent in this proceeding was a member of an Indian tribe. MCR 3.965(B)(2); see also *In re Morris*, 491 Mich at 108 n 18 (stating one indicator "sufficient to trigger tribal notice" was that "the child's family [had] received services or benefits from a tribe or the federal government that are available to Indians").

Nonetheless, mother has failed to establish that this error affected the outcome of the proceedings. There is no evidence in the lower court record that indicates that the child in this case has any tribal affiliation. In his initial case service plan, next to "Tribal Affiliation," the plan states "N/A"; in the initial court report, next to "Tribal Affiliation" for the child, the report

---

[2] MCL 712B.9(1) states provides in relevant part the following:

> In a child custody proceeding, if the court knows or has reason to know that an Indian child is involved, the petitioner shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending child custody proceeding and of the right to intervene. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, notice shall be given to the secretary in the same manner described in this subsection.

states "No." The only reference to the child's heritage is in the initial case service plan, which lists his race as "White." Further, the reason that mother received services from the Pokagon Band in her prior case was due to that child's father's membership with the tribe, not mother's. The child in this case has a different father than the child in mother's previous case. On appeal, mother does not claim to have any membership with an Indian tribe, nor does mother claim that the child's father[3] in this case is a member of an Indian tribe. Accordingly, mother has failed to establish that the result of the proceeding would have been different, e.g., that the child would have been entitled to the application of the protections for Indians available under the ICWA. See *In re Utrera*, 281 Mich App at 9.

Next, mother contends that the Department of Health and Human Services (DHHS) did not make reasonable efforts in light of her cognitive limitation. We disagree. This Court reviews whether the trial court clearly erred by finding that reasonable efforts were made to preserve and reunify the family. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014).

In general, before parental rights may be terminated, the DHHS must make " '[r]easonable efforts to reunify the child and family[.]' " *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010), quoting MCL 712A.19a(2). When a parent is disabled, the DHHS must make reasonable accommodations under Title II of the Americans with Disabilities Act (ADA), 42 USC 12131 *et seq.*, to ensure that the parent benefits from the services it provides. *In re Hicks*, 315 Mich App 251, 266-267; 890 NW2d 696 (2016), lv pending. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC 12132.

In *Hicks*, this Court addressed the standards for making reasonable accommodations in child protective proceedings when providing services to a cognitively impaired parent with an IQ was tested at 70. *In re Hicks*, 315 Mich App at 255, 271-283. Although the DHHS was aware of the mother's impairments, it spent two years providing services "geared toward a parent of average cognitive functioning." *Id*. at 260. After reviewing the related caselaw, statutes, regulations, and publications on the subject, the *Hicks* Court held that when a parent is known or suspected to have a "cognitive developmental or intellectual impairment,"

> the DHHS must offer evaluations to determine the nature and extent of the parent's disability and to secure recommendations for tailoring necessary reunification services to the individual. The DHHS must then endeavor to locate agencies that can provide services geared toward assisting the parent to overcome obstacles to reunification. If no local agency catering to the needs of such

---

[3] Mother was married when the child was born, but contests whether the legal father is the natural father. Regardless, mother does not contend that either the legal father or the putative father is a member of an Indian tribe.

individuals exists, the DHHS must ensure that the available service providers modify or adjust their programs to allow the parent an opportunity to benefit equal to that of a nondisabled parent. If it becomes clear that the parent will only be able to safely care for his or her children in a supportive environment, the DHHS must search for potential relatives or friends willing and able to provide a home for all. And if the DHHS shirks these duties, the circuit court must order compliance. [*Id*. at 282.]

Because those standards had not been met, the *Hicks* Court vacated the termination decision and remanded the case to allow the DHHS to provide the respondent services that reasonably accommodated her cognitive impairment. *Id*. at 286-287.

In this case, the child was removed from mother's care within days of his birth because of mother's previous termination. Shortly thereafter, the DHHS provided mother with a psychological evaluation. Mother also had two psychological evaluations as part of her previous case; one was done in 2013 and the other in 2014. Mother's psychological evaluations showed that she had limited cognitive abilities. In an effort to address mother's limitations in the prior case, in addition to regular normal parenting classes, the DHHS provided mother a one-on-one parenting coach to teach her how to properly care for an infant. The one-on-one coaching in addition to her parenting classes afforded mother the opportunity to reinforce what she learned in her parenting classes. Mother also received extensive counseling and mental health treatment as part of her previous services. In mother's current case, her caseworker searched for possible relative placements but was unable to locate any. Moreover, during mother's supervised parenting time, she received hands-on instruction regarding how to properly care for her infant. Accordingly, based on the extensive services mother received in her previous case and the DHHS's continued efforts in this case, we are not left with a definite and firm conviction that the trial court erred by finding that the DHHS provided mother with reasonable efforts in light of her cognitive limitation.

Mother next argues that the trial court erred by finding that a statutory ground for termination was proved by clear and convincing evidence. We disagree. "To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). This Court "review[s] for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence." *Id*.

Mother's rights were terminated under MCL 712A.19b(3)(g), (i), and (j). Under MCL 712A.19b(3)(j), a trial court may terminate parental rights if "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." A parent must sufficiently benefit from the services so that he or she has the attained a level of parenting skills that indicates the children would no longer be at risk of harm while in the parent's custody. *In re White*, 303 Mich App 701, 712-713; 846 NW2d 61 (2014).

During supervised visits with the child in this case, mother exhibited a severe lack of parenting skills. When the child would cry, mother would consistently attempt to soothe the

child by feeding him. Mother's caseworker explained to mother that there were other soothing tactics she could use when the child cried and demonstrated how to use those tactics with the child. Despite these demonstrations, mother continued to try to feed the child every time the child became upset. Further, although she was shown how to properly place the child in his car seat, mother was unable to properly buckle the child in his seat. According to mother's caseworker, these were the same parenting-skill problems that mother exhibited in her last termination, which also involved an infant child. Mother received a number of services in her prior case to address her lack of parenting skills, including parenting classes and a one-on-one parenting coach. Yet mother appeared unable to apply these lessons to parenting the child in this case. Accordingly, because mother did not benefit from her parenting lessons, the child in this case remained at risk of harm with her as caretaker. *Id*. Consequently, termination was proper under MCL 712A.19b(3)(j). Having concluded that at least one ground for termination existed, we need not address the additional grounds for termination identified by the trial court. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

Mother next argues that the trial court erred by finding that termination was in the child's best interests. We disagree. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). The trial court's determination of the child's best interests must be supported by a preponderance of the evidence. *In re Moss*, 301 Mich App at 90. Appellate courts review for clear error the court's decision regarding the child's best interests. *In re White*, 303 Mich App at 712-713.

When deciding whether termination is in the child's best interests, the trial court may consider the record as a whole. *In re JK*, 468 Mich 202, 211; 661 NW2d 216 (2003). "[T]he focus at the best-interest stage" is "on the child, not the parent." *In re Moss*, 301 Mich App at 87. The trial court must weigh all the evidence available to it in determining the child's best interests and may consider such factors as "the parent's parenting ability, the child's need for permanency, stability, and finality," *In re Olive/Metts*, 297 Mich App at 41-42, "and the possibility of adoption," *In re White*, 303 Mich App at 714.

As previously discussed, mother exhibited a severe lack of parenting skills despite having received numerous services to improve her skills. Mother also appeared unable to provide a safe and stable home environment. At the time of mother's termination proceeding, her current housing did not have running water. Mother's caseworker testified that mother's home smelled of dog urine and that he did not believe that the home was suitable for a child. Mother also planned to expose the child to abusive men. At the time of the termination trial, mother was in a relationship with a man who was currently in jail on charges of domestic assault involving mother. Mother told her caseworker that she intended to have the man move in with her when he was released from jail to help her raise the child. Moreover, mother had previously been in two abusive relationships during her prior termination proceedings. Both of those men assaulted mother and one of mother's children. In fact, one of the men was currently in prison for sexually assaulting one of mother's other children. As part of mother's services in her prior proceedings, she had counseling and domestic relations services to help her address this issue. Despite these services and the history of mother's abusive partners abusing her children, mother insisted that her current boyfriend live with her when he was released from jail. This evidences mother's inability to prioritize the safety of her children over her relationships with abusive men. Further,

the child's current placement indicated that they were willing to adopt the child if mother's rights were terminated. Accordingly, the trial court did not clearly err by concluding by a preponderance of the evidence that termination was in the child's best interests.

We affirm.

/s/ Jane E. Markey
/s/ William B. Murphy
/s/ Patrick M. Meter