# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
April 18, 2017

*In re* Hood, Minors.

Nos. 334377; 334378
Monroe Circuit Court
Family Division
LC No. 14-023222-NA

Before: FORT HOOD, P.J., and JANSEN and HOEKSTRA, JJ.

PER CURIAM.

Respondent-mother, A. Stevens, and respondent-father, J. Hood, each appeal as of right the trial court's order terminating their parental rights to the minor children, IH, LH, and BH, under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Because petitioner made reasonable efforts toward reunification and the trial court did not clearly err by terminating respondents' parental rights, we affirm.

The Department of Health and Human Services (DHHS) initiated the present case in April of 2014, when respondents had two children: IH and LH. The initial allegations involved threatened harm and improper supervision, medical neglect, incidents of domestic violence in front of the children, respondent-mother's use of cocaine and benzodiazepines, lack of suitable housing for the children, and the children's fear of respondent-father. Respondent-father had a long criminal history, and he was in-and-out of jail during the current proceedings. Both parents entered pleas, and the trial court assumed jurisdiction over the children, placing them with relatives.

The DHHS sought termination in the spring of 2015, but the trial court denied the request for termination at that time, concluding that respondents should be afforded more time to work toward reunification with their children. Proceedings continued, and respondent-mother soon gave birth to a third child, BH, whose meconium tested positive for cocaine at birth. Respondents entered pleas relating to BH, admitting that they had not completed services to allow for reunification with the children. BH was taken into care and placed with relatives.

During the case, the barriers to reunification, which the case service plans sought to address, related to parenting skills, domestic violence, housing, income, and substance abuse. Unfortunately, respondents made little effort to participate in, or benefit from, services; and, despite services, they remained unable to provide care for their children. Respondents failed to follow through on referrals and were discharged from programs for lack of participation. Respondents never obtained stable employment or suitable housing. Respondent-mother never

addressed her substance abuse problem, and both parents were arrested and convicted of additional criminal offenses during the course of the proceedings. Ultimately, the trial court terminated respondents' parental rights in July of 2016. Respondents now appeal as of right.

## I. REASONABLE EFFORTS TOWARD REUNIFICATION WITH MOTHER

Respondent-mother argues that the trial court erred by failing to recognize that she may have needed specialized services under the Americans with Disabilities Act ("ADA"), 42 USC 12101 *et seq.*, and by finding that petitioner had made reasonable efforts to reunify her with her children. Specifically, respondent-mother asserts that she has "mild mental retardation." She maintains that she informed caseworkers of this fact early in the proceedings but they failed to investigate the possibility of a disability and to tailor services to her particular needs. Absent reasonable accommodation for her disability, respondent-mother argues that termination of her parental rights was improper.

Because respondent-mother did not raise her ADA claim when the case service plan was adopted or soon afterward, and she instead waited until the second termination hearing to assert this issue, her ADA argument is, at best, unpreserved.[1] *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). Accordingly, we review this unpreserved issue for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id.* at 9. Whether reasonable efforts for reunification have been made is a factual finding by the trial court, which this Court reviews for clear error. *In re Fried*, 266 Mich App 535, 541-543; 702 NW2d 192 (2005). "A finding of fact is clearly erroneous where the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re Terry*, 240 Mich App at 22.

Reasonable efforts to reunify a parent and child must be made "in all cases" except those involving aggravated circumstances that were not present here. MCL 712A.19a(2); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). The reunification services must be offered in compliance with the ADA, meaning that, when providing services, the DHHS must "make reasonable accommodations for those individuals with disabilities so that all persons may receive the benefits of public programs and services." *In re Terry*, 240 Mich App at 25. If the DHHS fails "to take into account the parents' limitations or disabilities and make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family." *Id.* at 26. In the absence of reasonable efforts to reunite the family, termination may be considered premature. *In re Mason*, 486 Mich at 152; *In re Newman*, 189 Mich App 61, 66-71; 472 NW2d 38 (1991).

---

[1] Arguably, the issue is waived given respondent's failure to raise her ADA claim in a timely manner before the dispositional review hearing regarding termination. See *In re Terry*, 240 Mich App 14, 26; 610 NW2d 563 (2000).

However, any claim that the services being offered do not comply with the ADA must be raised in a timely manner, when the service plan is adopted or soon after, "so that any reasonable accommodations can be made." *In re Terry*, 240 Mich App at 26. Absent a request from a parent for reasonable accommodations, the DHHS's obligation to provide such accommodations, or to make further inquiry, only arises if petitioner is "faced with a parent with *a known or suspected* intellectual, cognitive, or developmental impairment." *In re Hicks*, 315 Mich App 251, 281-282; __ NW2d __ (2016) (emphasis in *Hicks*).[2]

> In such situations, neither the court nor the DHHS may sit back and wait for the parent to assert his or her right to reasonable accommodations. Rather, the DHHS must offer evaluations to determine the nature and extent of the parent's disability and to secure recommendations for tailoring necessary reunification services to the individual. [*Id.* at 282.]

In this case, despite the more than 2 years that this case was pending, respondent-mother did not request any specific accommodations, she never suggested that a disability prevented her from understanding the proceedings or complying with the proffered services, and ultimately she did not raise her ADA claim until the second termination hearing. Cf. *In re Frey*, 297 Mich App at 247; *In re Terry*, 240 Mich App at 27. Instead, the only complaint respondent-mother made with respect to her participation in services related to transportation difficulties, which the DHHS attempted to address by providing transportation assistance. In short, it is clear that respondent did not make a timely request for reasonable accommodations under the ADA. See *In re Terry*, 240 Mich App at 26.

We are also persuaded that the DHHS's efforts at reunification in this case cannot be considered unreasonable simply because respondent-mother reported that she had "mild mental retardation." See *In re Hicks*, 315 Mich App at 281-282. That is, although it is true that respondent-mother self-reported during the proceedings that she has "mild mental retardation," as emphasized by the trial court, there is no documentary evidence confirming this diagnosis, nor is there any evidence regarding what accommodations, if any, would be needed. Unlike in *Hicks*, there is also no indication that respondent-mother showed overt signs of a disability, and caseworkers made no mention of concerns about respondent-mother's mental abilities or their ability to communicate with her effectively. Cf. *id.* at 255, 283. Quite simply, it does not appear that DHHS was actually made aware of a disability which required reasonable accommodations under the ADA.

At most, respondent-mother's self-reporting of "mild mental retardation" might have triggered an obligation for further investigation by the DHHS. See *id.* at 282. In this regard, we note, as did the trial court, that respondent-mother was referred for psychological evaluation during the course of the proceedings, but she failed to attend and the fact thus remains that, despite efforts by the DHHS, there is no specific evidence relating to her disability or the accommodations needed. Cf. *id.* at 283-284. Even on appeal, respondent fails to explain the

---

[2] The Michigan Supreme Court has ordered oral argument on whether to grant an application for leave to appeal in *Hicks*. *In re Hicks*, 499 Mich 982; 882 NW2d 136 (2016).

precise parameters of her disability or the accommodations required. Absent more information about respondent-mother's self-reported disability, which respondent-mother effectively prevented the DHHS from obtaining, and in view of respondent-mother's failure to request accommodations, the DHHS cannot be faulted for failing to provide unspecified accommodations to respondent-mother.

More generally, we emphasize that this is a case where respondent-mother made very little effort, despite two years of services; and, given her failures with the services offered, respondent-mother cannot establish that DHHS's failure to provide unspecified accommodations affected the outcome of the proceedings. That is, the record makes clear that respondent was provided with extensive services, and there is no evidence that she was denied any services due to her report of "mild mental retardation." Cf. *In re Terry*, 240 Mich App at 27. Respondent-mother had the opportunity for individual therapy, substance abuse treatment, drug screens, psychological evaluations, visits with her children, parenting classes, economic and material assistance, and domestic violence counseling. Yet, she largely failed to avail herself of these opportunities. The record shows numerous referrals and re-referrals for services, which respondent-mother would begin, only to then be discharged for lack of participation. For example, respondent-mother never completed a substance abuse assessment, she missed numerous drug screens, and she eventually gave birth to a child with cocaine in his system. She was discharged from domestic violence counseling and parenting classes for lack of participation. Although she completed 12 sessions of individual counseling, she then failed to complete the additional sessions recommended by her therapist. As noted, respondent-mother also failed to follow through with referrals for a psychological evaluation. Respondent-mother also failed to make her home available to caseworkers seeking to assess the suitability of her home. As a result of respondent-mother's lack of participation, one of the agencies providing services refused to work with her altogether in 2016.

In other words, the record does not suggest that respondent-mother could have benefited from services had accommodations been made; rather, the record makes plain that respondent-mother made little or no effort to even participate in the services offered. "While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App at 248. Services were proffered to respondent-mother, but she failed to participate and to demonstrate that she sufficiently benefited from the services provided. Cf. *id.* On this record, the trial court did not clearly err by determining that reasonable efforts had been made, *In re Terry*, 240 Mich App at 22; and, we cannot conclude that some unspecified accommodations would have altered the outcome of the proceedings, meaning that respondent-mother has not shown plain error, *In re Utrera*, 281 Mich App at 9. Thus, respondent-mother is not entitled to relief.

## II. BEST INTERESTS

Respondent-mother also argues that termination of her parental rights was not in the children's best interests. In particular, she contends that the trial court clearly erred by characterizing the older children's bond with respondent-mother as "strained, awkward and in sum broken." Respondent-mother maintains that she has a bond with her children and, in view

of this bond, respondent-mother argues that termination was not in the children's best interests and that a guardianship should have been established in lieu of termination. We disagree.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012); MCL 712A.19b(5). This Court reviews for clear error the trial court's determination regarding the children's best interests. *In re Olive/Metts Minors*, 297 Mich App at 40; MCR 3.977(K). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Factors relevant to a determination of the child's best interests include: the child's bond to the parent, the parent's compliance with a case service plan, the parent's visitation with the child, the child's need for permanency, stability, and finality, the advantages of a foster home over the parent's home, and the possibility of adoption. *Id*. at 713-714.

The thrust of respondent-mother's claim is that the trial court clearly erred in its best-interests determination because she has a bond with her children. Yet, as a factual matter, the trial court concluded that her bond with IH (11 years old) and LH (seven years old) was "strained, awkward and in sum, broken." Respondent-mother disputes this factual determination by emphasizing the evidence favorable to her position, noting, for instance, that both children testified at trial that they love her and LH testified that he would like to live with respondent-mother. However, the credibility of this testimony and the weight to give the evidence was a question for the trial court. *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014). Moreover, notwithstanding the children's protestations of love, there was ample support for the trial court's conclusion that the relationship between respondent-mother and her other children was "strained, awkward and in sum, broken." In particular, the caseworker testified that the relationship was "a little awkward" and "strained." There was also testimony that IH no longer wanted to see her parents and LH made statements of indifference regarding his parents. Indeed, in contrast to his claim that he wanted to live with respondent-mother, LH also testified that he would like to continue living with his foster family. IH testified that she did not want return to living with respondents and she expressed an interest in being adopted by her foster parents. Further, the record also demonstrates that, after visitation with respondent-mother, the two older children were "upset" and exhibited uncharacteristic behavior, including meltdowns and backtalk. Neither child made a request to see respondent-mother after visitation was suspended in September of 2015. On this record, giving deference to the trial court's special opportunity to judge the weight of the evidence and the credibility of witnesses, we are not left with a definite and firm conviction that a mistake was made when the trial court found that the bond with IH and LH was "broken." See *id.*

Similarly, the trial court found that respondent-mother had no bond with BH, who was less than one year old and who had always lived with his foster family. The caseworker testified that because of BH's infancy, she was "not sure that he's ever bonded to his parents." Just like his siblings, BH was negatively affected by visits with respondent-mother. BH's foster mother testified that he was fussy and cranky afterward. The trial court did not clearly err in its finding

regarding the bond between respondent-mother and BH, or that the lack of a bond with the children weighed in favor of termination.

Moreover, even if respondent-mother could establish that the children were bonded to her, the parent-child bond is only one factor to consider. Respondent-mother failed to comply with the case service plan throughout the proceedings. As discussed earlier, she was repeatedly referred for services, which she did not complete. She does not have adequate housing and it does not appear that she would be able to care for the children in the foreseeable future. At the time of the termination hearing, she was on probation for new offenses committed during the proceedings, she was living at a shelter, and she admitted that she required additional services before she would be prepared to be reunited with the children. Despite the opportunity to participate in services, she had failed to improve her parenting skills and she had not addressed her substance abuse issues. Indeed, BH was born during the proceedings with cocaine in his system and respondent-mother never obtained a substance abuse assessment. At the time of the termination hearing, IH and LH had not seen respondent-mother for more than nine months and they only had visited with her six times in 2015. Respondent-mother had not seen BH in more than six months. Moreover, there was evidence that respondent-mother behaved inappropriately during the visits she did attend, such as arguing with the caseworker in front of the older children, and taking pills and appearing to fall asleep while holding BH. As the trial court found, respondent-mother's "future plans for the children are nil."

In contrast, the trial court found that all three children thrived in their foster homes. The older children's foster family addressed health issues the children had when they came into care and encouraged them to participate in extracurricular activities. The older children were described as feeling "safe" in their foster home. Likewise, BH's foster family cared for him when he left the hospital after birth and provided the necessary medical care for him to wean off methadone. Since that time, BH had met his growth milestones. All of the children are bonded to their foster families, the families are interested in adopting the children, and the families are willing to continue to facilitate a relationship between the older children (who are placed together) and BH. The record also demonstrates the children's need for permanency, stability, and finality. The older children's social worker opined that termination of parental rights was in their best interests, explaining that they have a strong bond to the foster family and need permanence. IH, in particular, had expressed an interest in finality and adoption by the foster family. Given the contrast in the loving "forever home" that the foster parents were able to provide and respondent-mother's inability to provide any home or care for her children, the trial court did not clearly err by finding that termination was in the children's best interests.

As an alternative to termination, respondent-mother argues that a guardianship could have been implemented and that the children's placement with relatives should have weighed against termination. However, the trial court disagreed and the trial court's conclusions were not clearly erroneous. That is, while a trial court may place a child with a guardian in lieu of terminating parental rights, MCL 712A.19a(7)(c), it is not required to do so, and it should not unless doing so is in the child's best interests. *In re COH*, 495 Mich 184, 199-208; 848 NW2d 107 (2014). The trial court noted that the foster families had worked with service providers toward reunification to "no avail." Respondent-mother did not comply with her case service plan and she failed to attend visitation consistently when she was allowed to visit. Respondent-mother is related to the foster families, but she has no relationship with them. The foster parents

were not interested in a guardianship given the previously-failed attempts at reunification and the children's need for stability and permanency. Given these facts, the trial court did not clearly err in determining that termination, rather than a guardianship, was the proper course of action.

## III. REASONABLE EFFORTS TOWARD REUNIFACTION WITH FATHER

Finally, respondent-father argues that the trial court clearly erred in finding that reasonable efforts for reunification were made, particularly because no services were offered to fulfill the case service plan while he was in jail. He argues that the trial court should have granted his motion for a directed verdict[3] and denied the petition for termination. We disagree.

As discussed, when a child is removed from a parent's custody, petitioner is required to make reasonable efforts to reunify the family. MCL 712A.19a(2); MCL 712A.18f(4). "The state is not relieved of its duties to engage an absent parent merely because that parent is incarcerated." *In re Mason*, 486 Mich at 152. In other words, a parent's rights may not be terminated solely because he or she is incarcerated. *Id.* at 160-161. Rather, even when a parent is incarcerated, the parent is entitled to participate in child protective proceedings and to participate in a DHHS service plan. *Id.* at 152-160. When a parent has not been afforded a meaningful opportunity to participate, termination of parental rights may be premature. *Id.* at 152; *In re Rood*, 483 Mich 73, 114; 763 NW2d 587 (2009).

For example, in *In re Mason*, the respondent was incarcerated when his children were removed from their mother's care and he was incarcerated during the child protective proceedings that followed. *In re Mason*, 486 Mich at 146-147. He participated in a pretrial hearing by telephone. *Id.* at 154-155. Then, for more than 16 months, no efforts were made to facilitate services or the respondent's participation in court proceedings. *Id.* at 155-158. Specifically, it was unclear whether the respondent even saw the initial case service plan, the DHHS failed to obtain the respondent's signature on the plan, the respondent was never evaluated, no efforts were made to update the initial case service plan, the DHHS provided no services, and no efforts were made to investigate the possibility of services in prison. *Id.* at 156-159. Yet, the respondent was reported as being noncompliant with the case service plan and, without any opportunity to participate in services, his rights were terminated, in part, because of his failure to comply with the service plan. *Id.* at 159-160. In these circumstances, the Michigan Supreme Court concluded that termination of respondent's parental rights was clearly erroneous. *Id.*

In this case, respondent-father attempts to liken his own circumstances to those in *In re Mason*. However, the present facts are easily distinguished from *In re Mason* and respondent-

---

[3] Procedurally, it does not appear that a directed verdict motion was technically appropriate in these child protective proceedings conducted without a jury. See MCR 3.911(C); MCR 2.516; *Stanton v Dachille*, 186 Mich App 247, 261; 463 NW2d 479 (1990). In any event, there is no merit to respondent-father's claim that he was denied reasonable efforts toward reunification, meaning that he was not entitled to a dismissal of the termination petition, either at the close of petitioner's proofs or at the conclusion of the proceedings.

father's reliance on that case is misplaced. That is, there is no indication that respondent was denied the opportunity to participate in court proceedings. Further, the record shows that the DHHS provided respondent with a case service plan and the opportunity to participate in numerous services. These facts support the trial court's determination that the DHHS complied with its statutory obligation to make reasonable efforts toward reunification. See MCL 712A.19a(2); MCL 712A.18f(4).

In particular, the record shows that respondent-father was in the county jail when the case began in April of 2014 and, for the next year, respondent-father spent much of his time in jail. He now asserts that the DHHS failed to provide services to him while in jail. However, according to respondent-father's own testimony, the only services available in jail related to substance abuse treatment and he was in fact able to participate in AA meetings. More importantly, even if the DHHS could be faulted for initially failing to provide respondent-father services while in jail, he was not in jail for the entire time this case was pending. The record shows that, during the year before the first termination hearing, respondent-father received a case service plan and he had opportunities to participate in services during times when he was released or in a Probation Residential Center (PRC) program, which allowed residents to leave to complete referred services. Instead, he absconded from the PRC facility and avoided the instant court proceedings to circumvent arrest. In April 2015, the referee nevertheless concluded that the threshold requirements of *In re Mason* were not satisfied and the DHHS's petition for termination was denied. Respondent-father was thus given additional time to work toward reunification with his children, and a new case service plan was prepared.

After the first-termination hearing, respondent was again in jail until June 2015. Upon his release, referrals for services were made and visitation was available. But, during the summer of 2015, respondent-father failed to communicate with the caseworker despite her repeated efforts at contact, which included numerous telephone calls, text messages, and the scheduling of a psychological evaluation which respondent-father failed to attend. After BH was born in August 2015, respondent-father showed an interest in restarting services, at which time the caseworker made new referrals, including referrals for individual counseling, parenting classes, and domestic violence counseling. Respondent-father either failed to initiate services or he was discharged for lack of participation. He also refused to participate in a home visit.

Respondent-father was again arrested around Thanksgiving 2015. Again, respondent-father was placed in a PRC in December 2015 and given an opportunity to complete DHHS services; but, he was discharged soon after entering the PRC because he failed to return on time and he appeared high on drugs when he did return. Rather than report to his probation officer for drug testing, he absconded and a warrant was issued for his arrest. While he evaded authorities for the next three months, he also failed to participate in services. Respondent-father was again arrested in March of 2016, and later sentenced to 24 to 60 months in prison with the Michigan Department of Corrections. Following his incarceration, a caseworker mailed defendant a copy of his parent agency treatment plan and she took some initial steps toward facilitating services for respondent-father, including completing the paperwork necessary to arrange to meet with respondent-father in prison.

On this record, the trial court did not clearly err when it determined that reasonable efforts at reunification had been made. While respondent-father complains that he did not

receive services while in jail, it is not clear that services apart from substance abuse treatment were available to him in jail and, in any event, the facts plainly show that he was not in jail for the entirety of these proceedings. There were significant periods of time when he was on release or in the PRC program. During those times, he amply demonstrated an unwillingness to participate in, and benefit from, the numerous services made available to him, including counseling, psychological evaluations, parenting classes, drug assessments, and domestic violence counseling. See *In re Frey*, 297 Mich App at 248. In short, unlike *In re Mason*, the record shows that the DHHS provided respondent-father with a case service plan and numerous referrals for services. Thus, we are not left with a definite and firm conviction that the trial court erred when it found that petitioner made reasonable efforts for reunification. Termination was not premature.

Affirmed.


/s/ Karen M. Fort Hood
/s/ Kathleen Jansen
/s/ Joel P. Hoekstra