*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re PEREZ/DUPREE, Minors.

UNPUBLISHED
May 14, 2019

Nos. 345451
Kent Circuit Court
Family Division
LC Nos. 17-050620-NA;
    17-050621-NA;
    17-050622-NA

In re DUPREE, Minors.

No. 345455
Kent Circuit Court
Family Division
LC No. 17-050621-NA;
    17-050622-NA

Before: GLEICHER, P.J., and RONAYNE KRAUSE and O'BRIEN, JJ.

PER CURIAM.

In Docket No. 345451, respondent-mother appeals as of right an order terminating her parental rights to three minor children, AP, ND, and AD, under MCL 712A.19b(3)(c)(*i*) (failure to rectify the conditions leading to adjudication) and (g) (failure to provide proper care or custody). In Docket No. 345455, respondent-father appeals as of right the same order, which terminated his parental rights to ND and AD[1] under the same grounds. We affirm.

In September 2016, AP began having a serious, recurring problem with lice and, as a result, missed a large number of school days. A visit to respondents' home, where they lived with the three children, revealed issues with cleanliness, such as feces spread on a wall. Workers with Families First and Families Together Building Solutions were assigned to work with the

---

[1] AP's father was originally a respondent in the proceedings below, but he voluntarily released his parental rights and is not a party to this appeal.

family, but the cleanliness and lice issues persisted. In March 2017, the home was observed with feces in a doorway and on a wall, food on the floor, and flies and cockroaches inside, and one of the children had feces on his toes. Thereafter, the children were removed from the home, and the court took jurisdiction. Over the course of the next 17 months, respondents participated in several parenting classes and some other offered services, but after the 17 months, they still had not improved in enough areas of concern for workers to feel confident returning the children to them. The trial court terminated respondents' parental rights in August 2018.

Respondents now appeal.

## I. DOCKET NO. 345451

## A. REASONABLE EFFORTS

Respondent-mother contends that the Department of Health and Human Services (DHHS), in its attempts to reunify the family, did not put forth reasonable efforts to accommodate respondent-mother's cognitive impairments.

In general, the DHHS is required to make reasonable efforts to reunify a family after removing a child from his or her home. *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). "[E]fforts at reunification cannot be reasonable . . . unless [the DHHS] modifies its services as reasonably necessary to accommodate a parent's disability." *In re Hicks*, 500 Mich 79, 90; 893 NW2d 637 (2017). "And termination is improper without a finding of reasonable efforts." *Id*. We review for clear error a trial court's finding regarding reasonable efforts. See *In re Fried*, 266 Mich App at 542-543.[2] A finding is clearly erroneous if, though some evidence supports it, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

Respondent-mother contends that the case manager, Emily Murray, should have assisted respondent-mother in completing respondents' budget document so that respondents could obtain bus passes.[3] We reject this argument and conclude that the DHHS's actions were reasonable as they related to respondent-mother's completing of her budget document. Murray testified that the budget document was easy to complete, and while respondent mother had some comprehension limitations, she was able to read. In addition, Murray stated that respondent-

---

[2] It is questionable whether respondent-mother adequately preserved some of her arguments about reasonable efforts because she did not "object or indicate that [some of the services she now complains of] were somehow inadequate." *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). We nevertheless analyze all of her arguments as if they are properly preserved.

[3] Respondent-mother, in her appellate brief, refers to bus passes *and* gas cards. Murray stated that it was agency policy to see a budget before approving bus passes or gas cards. However, Murray indicated that the agency had already been providing gas cards to assist in transportation needs, but that a budget was needed to provide bus passes in particular. There was no suggestion throughout the case that purchasing gas was an issue needing any further resolution.

father was considered to be respondent-mother's "primary support," and "it was encouraged that they complete these things [such as the budget document] together as it has been throughout the case." And there are no allegations in this case that respondent-father had any cognitive impairments or any trouble with understanding written forms. Moreover, Murray stated at the April 25, 2018 hearing, which occurred on a Wednesday, that the issue about needing bus passes "was just expressed on Friday."[4] Finally, respondent-mother implies on appeal that she missed appointments because of the issue with bus passes, but Murray stated that respondent-mother missed appointments for various reasons, such as "sleeping in," not just because of transportation issues. Under all the circumstances, respondent-mother has not demonstrated that the DHHS's efforts were unreasonable in this respect.

Respondent-mother next contends that the DHHS's efforts were not reasonable because respondent-mother was not able to understand what was required of her. This is belied by the testimony throughout the case. On May 9, 2017, Murray outlined the steps she was taking to ensure respondent-mother's comprehension and stated that respondent-mother appeared to understand what was being asked of her. Murray provided similar testimony on August 1, 2017; November 1, 2017; January 31, 2018; April 25, 2018; July 5, 2018; and August 14, 2018. The supportive-visitation worker, too, testified that respondent-mother appeared to be understanding matters. Finally, Murray testified that she spoke with the instructors for respondent-mother's parenting classes "to instruct them about her impairment." Given all the testimony, respondent-mother's argument about her alleged failure to understand the case requirements is without merit.

Respondent-mother also argues that the DHHS's efforts at reunification were insufficient because the DHHS did not continue referring respondent-mother to parenting classes despite (1) that parenting skills remained an issue and (2) knowing that respondent-mother needed repetition because of her cognitive deficiencies. We disagree that the DHHS's decision to not refer respondent-mother to more parenting classes rendered its efforts unreasonable. During the course of these proceedings, respondent-mother completed four parenting classes, with the last one ending on March 28, 2018—approximately 4½ months before the start of the termination hearing.[5] And respondent-mother admits on appeal that after she completed her fourth parenting class, "a case aide provid[ed] some guidance during visits." Murray stated that after respondent-mother completed her fourth class, the focus was on "maintaining the skills that were learned in those four classes," and she explained that the case aide assisted respondent-mother in doing so. Murray herself also met with respondent-mother often. In addition, Murray stated that the supportive-visitation class that respondents completed had seemed "to be the best fit of [a] parenting class that [she] could imagine for this family" because of the extra work and modeling behavior that the instructor performed. Finally, Murray testified that respondent-mother declined the referrals for a "supports coordinator" and a "parent support partner." Under all the circumstances, the DHHS sufficiently accommodated respondent-mother's learning difficulties

---

[4] The case commenced on March 9, 2017, and the termination hearing commenced on August 14, 2018.

[5] It is not clear why respondent-mother states in her appellate brief that eight months had elapsed between the last parenting class and the termination hearing.

by attempting to repeatedly introduce her to the skills she needed by referring her to four parenting classes, and then attempting to reinforce those skills during visits. Thus, the DHHS's reunification efforts in this respect were reasonable.

Respondent-mother's final reasonable-efforts argument is her allegation that the DHHS should have viewed respondent-mother's father, TR, as a supportive person for respondent-mother and worked toward allowing the family to live in TR's home with his assistance. To support her argument, respondent-mother cites this Court's opinion in *In re Hicks*, 315 Mich App 251; 890 NW2d 696 (2016), rev'd in part 500 Mich 79 (2017). There, this Court stated that if a supportive environment is required in order for a cognitively challenged parent to care for her children, "the DHHS must search for potential relatives . . . willing and able to provide a home for all." *In re Hicks*, 315 Mich App at 282. However, our Supreme Court vacated that part of this Court's opinion. *In re Hicks*, 500 Mich at 88 n 6. The Supreme Court explained:

> While the Court of Appeals reasonably identified measures [the DHHS] should consider when determining how to reasonably accommodate a disabled individual, we do not believe these steps will necessarily be implicated in every disability case. Trial courts are in the best position, in the first instance, to determine whether the steps taken by [the DHHS] in individual cases are reasonable. [*Id.*]

The DHHS here chose the route of intensive parenting classes, using respondent-father and others as support persons, and using continual actions and reminders to ensure that respondent-mother knew what was being asked of her. In addition, respondent-mother had a guardian ad litem (GAL) appointed for her. The trial court found the DHHS's efforts reasonable, and this decision was not clearly erroneous.[6]

## B. STATUTORY GROUNDS

Respondent-mother makes certain objections to the trial court's findings regarding the statutory grounds for termination.[7]

To terminate parental rights, the trial court must initially find, by clear and convincing evidence, a statutory ground for termination under MCL 712A.19b(3). *In re Mason*, 486 Mich at

---

[6] Whether it would have been better for the children for the family to live together in TR's home is a separate question from reasonable efforts and will be discussed in section I.C. of this opinion.

[7] Respondent-mother included her objections to the trial court's statutory-grounds findings in her reasonable-efforts argument. While this Court has stated that an appellant waives an issue if she fails to raise it in the statement of questions presented for appeal, *People v Fonville*, 291 Mich App 363; 804 NW2d 878 (2011), we decline to hold that the issue is waived and therefore address all of respondent-mother's arguments on appeal.

152. This Court then reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground has been established. *Id*.

The trial court terminated respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*) and (g), which state:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Respondent-mother contends that the trial court erred by relying on a lack of housing in finding statutory grounds for termination. The trial court did *mention* at one point during its lengthy oral opinion that the DHHS wanted to see a stable housing situation for six months. During the termination hearing, Murray stated that respondents had obtained safe housing with TR and that TR was not going to evict them, but she was concerned about stability because "[t]ypically we like to see six months of stable housing," and respondents' housing situation had not been stable for that long. TR, however, testified that respondents could live with him for as long as they wanted and that he would be willing to sign a binding lease if required by the DHHS. Based particularly on TR's testimony, it appears that respondents had largely resolved their issues with housing.[8] However, the trial court simply did not place any emphasis on housing when discussing its findings on the statutory grounds. The court, instead, focused on cleanliness issues, lack of follow-through and responsibility, deficiencies in basic parenting skills, chaotic visitations, and respondents' inability to keep appointments. Respondent-mother's appellate argument about housing does not provide a basis for relief because the trial court did not rely on a lack of housing to terminate parental rights.

---

[8] The trial court appeared to recognize as much, stating, "I understand the parties have a place to live in [TR's] home."

Respondent-mother also argues that the trial court should not have relied on the issue of employment in discussing statutory grounds because respondent-mother was not required to obtain employment during the case and, in any event, respondent-mother had in fact obtained a job. It is true that respondent-mother was not required to obtain employment as part of her treatment plan. In making its findings, the court stated, "They just got jobs. I don't know if they even have stability with respect to that." But like housing, the trial court did not place great emphasis on the employment issue, and instead focused on cleanliness issues, lack of follow-through and responsibility, deficiencies in basic parenting skills, chaotic visitations, and the inability to keep appointments. Thus, respondent-mother's argument about employment does not provide a basis for relief.

Respondent-mother next contends that the trial court should not have relied on parenting skills to terminate parental rights because, in part,[9] respondent-mother's progress demonstrated that she would be able to rectify any deficiencies within a reasonable time.

It is true that respondent-mother made improvements in her parenting. However, the supportive-visitation instructor characterized respondents' progress as "half and half" in terms of nutrition for the children, and she listed outstanding areas of concern such as the stress of respondents' relationship with each other, follow-through on mealtimes, and dealing with emotions for themselves and the children. Significantly, the instructor did not feel confident about either respondent parenting without assistance. Also, Murray testified that she had noticed a lack of co-parenting and a lack of structured activities with the children, and she, too, believed that respondents still needed assistance with parenting. In light of the testimony about continued parenting deficiencies, the trial court did not err by relying on these deficiencies.

These parenting deficiencies, in turn, provided support for the trial court's conclusion on statutory grounds for termination. Along with continued concerns about parenting skills, respondents still seemed to struggle among themselves about who would be responsible for cleaning, and cleanliness was a primary issue in this case. There were also concerns raised during visits; Murray testified that she saw limited engagement and a lack of structured activities with the children at a recent visitation. And respondent-mother did not seem to be convinced that she had been responsible for the neglectful situation the children had faced. There also continued to be problems with the respondents' ability to keep appointments, and the children had various issues for which they needed to attend numerous appointments.

At the April 25, 2018 hearing, the children's GAL stated that "[t]his is one of the worst cases of when kids came into care of neglect that [she had] seen in the years [she had] been doing this." She said, "This was one of those stories where these kids had lice visibly jumping off their heads, they're coated in excrement." She added, "It was terrible." It is true that

---

[9] Respondent-mother also argues that the trial court should not have relied on parenting skills because respondent-mother should have been provided with more parenting classes. As discussed earlier, the record does not support that respondent-mother should have been provided with more parenting classes, so we need not address this aspect of respondent-mother's argument.

respondent-mother had made recent strides in addressing the issues in this case, but in light of the limited nature of her progress,[10] the trial court did not clearly err by finding that the conditions leading to adjudication continued to exist. MCL 712A.19b(3)(c)(*i*).[11]

Nor did the trial court clearly err in analyzing the possibility of rectification of issues within a reasonable time considering the children's ages. See MCL 712A.19b(3)(c)(*i*). Given the amount of time that this case was ongoing and the number of obstacles to reunification that still remain, we do not have a definite and firm conviction that the trial court made a mistake in finding that issues would not be satisfactorily rectified within a reasonable time.

## C. BEST INTERESTS

Respondent-mother contends that the trial court erred by determining that it was in the children's best interests to terminate respondent-mother's parental rights.

"If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the children's best interests." *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (quotation marks and citation omitted); see also MCL 712A.19b(5).

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted.]

This Court reviews for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

We are mindful, as was the trial court, that the children had a strong bond with respondents and that the children's foster-care situation had been through various changes and they were no longer in a pre-adoptive home. Indeed, it is difficult to contemplate the children

---

[10] The mere participation in a service plan is not the crucial point when it comes to services; the issue is whether a parent has sufficiently *benefited* from the services. See, e.g., *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

[11] Only one statutory ground is needed for termination of parental rights; affirmance is appropriate if one ground was properly established, even if the lower court erred in analyzing other grounds. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

-7-

being moved yet again. However, we are charged with determining whether the trial court *clearly erred* in it decision, and we cannot find clear error. The trial court referred to improper parenting, and evidence supported that respondents were still not ready to parent on their own.[12] The trial court also noted how much the children had improved in foster care,[13] and given respondents' continual issues with managing appointments, it is reasonable to conclude that returning the children to them could result in regression. Also, Murray stated that it would take six more months of substantial progress before respondents would even be considered for the Family Reunification Program. That this progress would occur was questionable. Although respondents had made some progress in the case, primarily in the several weeks before termination, this progress had taken a long time to come about. We are not left with a definite and firm conviction that the trial court made a mistake by determining that the children would be better served by allowing the DHHS to actively pursue adoption possibilities instead of allowing the children to keep attending visitations and keep wondering if one day they might be returned to respondents.[14]

Respondent-mother next contends that the DHHS should have allowed the family to live together in TR's home, with TR acting as a support person for respondent-mother's intellectual deficiencies. TR's home had been deemed appropriate, and he testified that he was willing to be a support person for respondents. But even if respondents were to continue living with TR, they still would be the children's parents and still would need to demonstrate proper parenting techniques. But as explained, respondents had not shown sufficient progress in that area even with the support of the DHHS,[15] and there was no guarantee that they would ever get to a point of demonstrating sufficient progress. Under the circumstances, the trial court did not clearly err in analyzing the children's best interests.

---

[12] Respondent-mother, in the context of this issue, reiterates her allegation that the DHHS failed to accommodate her cognitive deficiencies because it did not offer additional parenting classes. This allegation is addressed in section I.A. of this opinion.

[13] This improvement was supported by testimony. Of particular note are the extensive dental needs the children had that were finally addressed once they entered foster care.

[14] Respondent-mother argues that the trial court, in analyzing the children's best interests, should not have relied on concerns about lice and uncleanliness because these issues pertained to the period "prior to the case coming before the court." But the ultimate point is that respondents had not shown sufficient improvement in their parenting techniques to demonstrate that the children would not again be subject to hygiene concerns if returned to respondents.

[15] Respondent-mother's attorney implied that the DHHS had been dilatory by failing to ask TR to be a "support person" for respondent-mother. But the DHHS was already relying on respondent-father and on respondent-mother's mother as support persons. Testimony revealed that respondent-mother's brother and TR were also involved, but they were "not as consistently present or involved as supports for her."

## II. DOCKET NO. 345455

Respondent-father's sole argument on appeal is that the trial court clearly erred by concluding that it was in the children's best interests to terminate his parental rights.

Despite the bonds between respondents and the children, and despite the changes in the children's foster-care situation, we cannot conclude that the trial court clearly erred in its decision, given (1) the evidence that respondents were still not ready to parent on their own, (2) how much the children had improved in foster care, and (3) Murray's testimony that it would take six more months of substantial progress before respondents would even be considered for the Family Reunification Program. Testimony at the termination hearing indicated that respondent-father was still, even during recent visits, failing to engage properly with the children, and this did not bode well for respondent-father's future progress.

Respondent-father argues that he tried to keep the home clean and appears to be arguing that his incarceration prohibited him from doing so. It is true that respondent-father was taken into police custody on September 28, 2016. His incarceration lasted until June 8, 2018, although he was out on bail for a period. AP's lice problems arose in "late September" of 2016. However, even assuming that the issues with lice were noticed after respondent-father was taken into custody, a police officer, when making a home visit on September 28, 2016, *before* respondent-father was taken into custody, could smell a bad odor coming from the residence even when standing on the porch. In addition, the officer observed feces smeared on a wall and noticed an odor of urine in the home. Also, a Families First worker testified that she worked with the family for over a month, starting in November 2016, and that respondent-father was living in the home at the time. She stated that feces in the home continued to be a problem. Accordingly, it does not appear that respondent-father was particularly successful in his alleged efforts to keep the home clean. Moreover, respondent-father was dilatory in his supposed efforts to obtain employment, and despite his lack of cognitive impairments he did not adequately help to keep respondent-mother on track with her appointments. Given all the circumstances, respondent-father's argument about attempting to keep the home clean does not provide a basis for reversing the decision of the trial court.

Respondent-father also makes an argument about a guardianship with TR.[16] His argument is not that the trial court erred by failing to order that the parties pursue a guardianship with TR,[17] but that the trial court erred by failing to consider this approach. He states that "guardianship should have been considered and weighed against termination." The trial court, at one point in its lengthy oral opinion, mentioned that "termination versus guardianship" had been raised as an issue. It is true that during its ultimate resolution of the best-interests issue, the trial court did not refer again to the issue of guardianship. However, the trial court ordered termination, and it referred to the "the children's need for permanence." Under these circumstances, it is reasonable to conclude that the trial court *did* consider the possibility of

---

[16] TR stated that he was open to a guardianship.

[17] We note that no petition for guardianship had been filed.

pursuing a guardianship and rejected this approach. Accordingly, respondent-father's appellate argument is without merit.[18]

To the extent that respondent-father can be deemed to be arguing that it was in the best interests of the children to pursue a guardianship instead of terminating respondents' parental rights, this argument, too, is unpersuasive. Murray was asked about a possible guardianship, albeit in the context of a different relative, and she stated, "I do think adoption is appropriate. I do not think guardianship would necessarily be in their best interest, especially due to the age of [ND and AD], but also due to the poor to partial participation of the parents in this case." The attorney for the DHHS said that the potential advantage of a guardianship was that "maybe in the future the parents may get themselves together to the point of the children could be returned to them." The attorney then asked if respondents had "demonstrated that hope," and Murray replied, "No." Murray stated that the children needed permanency after the many months of the proceedings. The children's GAL was also against a guardianship because of the children's need for permanency. In addition, TR initially testified that respondents' home was unacceptable, but later stated that aside from bugs, it had been "not that bad really." Moreover, Murray testified that TR had disagreed with the decision to remove the children from the home. Under the circumstances, the trial court did not clearly err by deciding that termination, rather than pursuing a guardianship with TR, was in the best interests of the children. There is no basis for reversal.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause
/s/ Colleen A. O'Brien

---

[18] Respondent-father appears to be arguing that the trial court violated the requirement from *In re Olive/Metts*, 297 Mich App at 43, that a trial court, in determining best interests, must consider a child's placement with a relative. But the children were not placed with a relative at the time of termination. Accordingly, the argument about *In re Olive/Metts* is not tenable.