*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HOGAN, Minors.

UNPUBLISHED
December 21, 2023

No. 365923
Branch Circuit Court
Family Division
LC No. 21-006247-NA

Before: RICK, P.J., and SHAPIRO and YATES, JJ.

PER CURIAM.

Respondent mother[1] appeals as of right the order terminating her parental rights to her minor children, LH, EH, and NH, under MCL 712A.19b(3)(c)(*i*) (more than 182 days passed and the conditions leading to adjudication have not been remedied with no reasonable likelihood of rectification given child's age), MCL 712A.19b(3)(g) (parent, while financially capable, fails to provide proper care or custody with no reasonable likelihood of doing so given child's age), and MCL 712A.19b(3)(j) (reasonable likelihood of harm if child returned to parent). We affirm in part, reverse in part, and remand for additional proceedings consistent with this opinion. We retain jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a petition by the Michigan Department of Health and Human Services (DHHS) to terminate mother's parental rights to her minor children, ZT, LH, and EH.[2] The petition alleged mother was unable to provide proper support for her children and her home environment was unfit for the children. The petition further noted mother's children suffered

---

[1] While some of the fathers of the children were involved in the proceedings below, they are not parties to this appeal. Therefore, we will refer to respondent simply as "respondent" or "mother".

[2] ZT's father took custody of ZT, and ZT is not a child at issue in this appeal. NH had not been born at the time of the initial petition's filing.

-1-

multiple injuries due to her inadequate supervision, she failed to provide for her children's medical needs, and she had a history of dating abusive men.[3]  Mother had five previous substantiated investigations for child abuse or neglect in 2016, 2017, 2018, 2020, and 2021.  A petition adding NH to the case was filed one day after she was born on the basis of the previous petition.

Throughout the duration of the case, mother moved often and her housing situation was inconsistent and unreliable.  Mother contended she was looking for suitable housing for her and her children, but that she needed a three-bedroom apartment for the family, which was difficult to come by, and she was on numerous waiting lists.  Mother also had inconsistent employment, but this was attributable to her disability, for which she received state support.  It took some time, but mother also eventually obtained Supplemental Security Income benefits as well.  Mother underwent a psychological evaluation, and was evaluated to have an IQ of 66, which fell within the "Extremely Low range."  According to the evaluation, mother experienced deficits in verbal and nonverbal reasoning and ability, nonverbal processing, ability to problem solve, ability to be flexible regarding thinking, working memory, mental alertness, and ability to process and retain information.  Dr. Randall Haugen, the evaluating psychologist, explained that this meant mother could be easily overwhelmed and may experience difficulties with independent problem solving.  He further explained that she may be easily manipulated in relationships.  Dr. Haugen noted that, on the basis of mother's past conduct regarding her relationships and employment history, her diagnosis may "affect her ability to maintain stability of a household, and consistency needed, and understand what's going on with her children."  The results of the evaluation made it clear that mother would need extra assistance and resources in order to successfully parent the children.  The

---

[3] We note there is no evidence in the record any of the men respondent dated were abusive toward her children.  "The fact that respondent was or is a *victim* of domestic violence may not be relied upon as a basis for terminating parental rights."  *In re Jackisch/Stam-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022).  To the extent the trial court may have relied on respondent's status as a victim of domestic violence, this reasoning was in error.  However, the record also indicates the trial court's references to respondent's problematic relationships was a reflection on her poor decision-making skills, and there were ongoing concerns during the duration of the case that respondent was prioritizing her partners over her children.  Respondent's psychological evaluation also cautioned her "vulnerability to being exploited or taken advantage of by others[,]" citing, in part, her "more chronic issues of instability in terms of her relationships and housing."  This concern was also noted in her earlier psychological evaluation, which suggested respondent was someone who, "once involved in a relationship, [] will be more dependent on others and persist despite negative treatment."  Therefore, to the extent the trial court considered respondent's relationship history as evidence of her impaired decision-making capabilities that affected her ability to parent, this was not in error.  We lastly note there were allegations in the petition about respondent allowing her boyfriend at the time to drive her children "in a vehicle without a license plate, registration, [or] insurance[,]" and to "smoke cigarettes and marijuana around her children and in the car."  While these allegations were not explicitly addressed by the trial court, there were allegations that at least one of respondent's boyfriends was unsafe for the children to be around.

evaluation concluded mother was vulnerable "to being exploited or taken advantage of by others[,]" and:

> In terms of parenting, there is no direct evidence that she will become physically abusive in a parenting situation. She is although likely to become easily overwhelmed and increasingly inflexible in her thinking, particularly as stress increases. She will have difficulties generating alternative and effective solutions to problems and will likely be overwhelmed by parenting interactions that are complex and involve a lot of emotion. She is also vulnerable to negative relationship patterns which can create a highly stressful environment for her children. Despite this, she desires to parent her children and is willing to engage in services.

Finally, the evaluation determined:

> [Mother's] prognosis for developing the needed stability and skills to independently parent her children within the next 9 to 12 months [was] poor. Her problems [were] long-term in nature and involve[d] issues of instability and negative relationships. These are complicated by significant cognitive deficits that impair her judgment and interfere with her ability to plan ahead and anticipate the consequences of her behaviors.

At the termination hearing, mother requested additional time to obtain housing and additional stability. Mother's aunt, with whom mother's children were placed, testified against terminating mother's parental rights, but asserted, if the trial court were to terminate mother's parental rights, she was willing to adopt the children. The lawyer-guardian ad litem believed mother's case was one of the "toughest of calls," and noted, if the trial court were to consider guardianship, the children would likely be in guardianship until they turned 18 years old. DHHS agreed that mother loved her children, and was consistent with attending parenting time visits. However, DHHS expressed concern regarding mother's ability to supervise her children by herself, because there was always another person there to help during visits. While mother actively participated in the majority of services offered to her, DHHS opined she made minimal progress toward her goals.

Several individuals who worked with mother over the course of the proceedings leading to termination also testified at the trial. Colene Ashcraft, formerly the director of a homeless shelter and nonprofit organization called Family Promise, testified that mother stayed at the shelter while pregnant with NH, and that she participated in parenting classes while she was a resident. Ashcraft testified that mother seemed to understand everything she was learning and was fully engaged with the lessons she was learning.

Aspen Leonard, a foster-care manager for DHHS, testified that mother consistently participated in individual therapy and successfully completed parenting classes and an extended parenting course with Wellsprings Lutheran. Mother also consistently participated in parenting classes at another organization as well. Leonard noted that mother always came prepared for parenting time and would go out of her way to get supplies for the children. The only negative aspect regarding parenting time courses was that mother was one course away from finishing

parenting classes at the homeless shelter but did not complete the program. Leonard indicated that mother had attempted to maintain employment and had recently been approved for social security disability insurance. Leonard also noted that mother's housing situation had been unstable and that she had continued to engage in relationships with men who abused her.

Leonard testified that if the children were returned to mother, then mother would also receive approximately $700 in disability payments for LH's care, as he has a neurological delay and was in speech therapy classes. Leonard confirmed that mother never missed parenting time and arranged transportation on her own despite not having a driver's license. Leonard also noted that mother "adores her children and her children adore her." However, Leonard believed that the children deserved to be in a stable home. Leonard explained that she did not feel that mother was benefiting from services because she was still involved in relationships with abusive men and "not living on her own independently." Leonard testified that mother remained on the waiting lists for several apartment complexes and was actively searching for housing.

Laura Crawford, who described herself as an "early head start home visitor through the branch intermediate school district [sic]" was also presented as a witness. She testified that she had been working with mother and the children since May 2019. She provided weekly home visits and community resource referrals, addressed any needs that mother may have, and offered guidance regarding parent and child interactions and child development. Crawford explained that mother "does a fantastic job" interacting with the children, specifically stating that mother "will sit on the floor during the parent child interactions. She listens to the reasoning behind the activities that we're doing, how that helps her children develop and grow. She will listen to strategies and things to do with her children to help them grow and develop better."

Amy Glover, a peer support worker with Pines Behavioral Health Services, testified that she had been working with mother for just over a year by offering case management, therapy, and peer support. Glover explained that mother regularly attended all programs with Pines Behavioral Health Services and that mother appeared to benefit from the services offered, specifically stating that the only concern with mother was "just the housing situation." She explained that Pines Behavioral Health Services had also been assisting mother with obtaining housing and that applications were being filled out and follow-up calls are being made, but "because of the circumstances it's not going well." Glover explained that mother did not qualify for anything more than a one-bedroom apartment because she did not have her children with her.

Mother also testified on her own behalf. She agreed that her housing situation had been unstable. Mother stated that she had been staying with her grandmother and at a friend's home and that she continued to apply and call to check on her housing applications. Mother explained that several representatives from different apartment complexes had told her that she could not get housing because she did not have her children with her and that some apartments were concerned after discovering that DHHS was involved with the children. Mother explained that she was on Medicaid, was continuing services at Pines Behavioral Health Services, and was continuing counseling. She believed that she participated in every service that DHHS had asked her to participate in, and attested that the only service that she did not complete was one portion of a parenting program that she voluntarily participated in on her own. She stated that she had asked to complete the course through Pines Behavioral Health Services, but that they did not have a

worker who was qualified to run the program. Mother was also taking classes through an organization called Beginnings Care for Life.

During her testimony, mother proposed a guardianship for a "year or two" so that she could obtain housing. She noted that during a family team meeting, two DHHS workers "told [her] that [she] needed to go home and have a serious talk with [her] aunt about adoption." Mother testified that DHHS had indicated to her, on more than one occasion, that she needed to talk to her aunt regarding adopting the children, implying that mother should "sign off."

Mother's aunt, Amy Scherer, was also presented as a witness. Scherer testified that in October 2022, she wrote a letter to the trial court to explain that she did not feel that termination was appropriate because mother had "been doing everything that she has been asked to do except with that housing because she keeps getting denied, or she is on a waiting list." Scherer explained that she had regular contact with mother and that the only "key issue" she was aware of was housing. Scherer did not see any other issues with mother being able to take care of the children. She testified that she was open to a potential guardianship to provide mother with additional time to obtain housing.

Before the trial court delivered its ruling, the lawyer-guardian ad litem observed that the parties had considered placing the children under guardianship. He stated:

> I'm not sure if these kids would notice a difference, but if you do a guardianship, Judge, I do think there has to be a little bit of—for lack of a better term, a come to Jesus talk here where we've got to stop enabling [mother]. I'm not saying not be nice to her and not encourage her, but we also have to be frank with her when she's not doing enough and when it's not okay, because I understand what her IQ is and we have to do a delicate balance between judging her based on her IQ and holding her to the standards of another parent. Because I can tell you with some certainty if this was any other parent I wouldn't be having this discussion, I'd say terminate. They're not doing anything. They're not doing enough.
>
> But I do think she gets judged in light of that, and she gets a little extra wider birth [sic]. But it can't be so wide that we never say you're not doing the stuff you need to do here, like making appropriate choices in your relationships and taking a few moments to see what the actual real housing options are for you and not coming up with some plan every single time that largely relies on somebody else.

In explaining its decision regarding the existence of statutory grounds for termination, the trial court emphasized (1) mother's relationships, one of which resulted in mother's boyfriend running over her foot; (2) the evaluation, which noted concerns about mother's ability to parent her children without assistance, and which determined mother's problems were long-term and complicated; and (3) the fact that some of mother's children had special needs and needed an even higher level of care. The trial court had "no doubt that [mother] loves her children" and wanted "the best for her children." However, the problem was mother had not "gotten to the point yet where she can have her children, so how long do we keep this going for?" The trial court found more than 182 days had elapsed since the initial disposition, and mother had not rectified the issues which brought the children into care within that time, satisfying MCL 712A.19b(3)(c)(*i*). The trial

court further found MCL 712A.19b(3)(g) was satisfied, because, while mother received financial assistance from the state, she had still proven unable to properly care for the children, and MCL 712A.19b(3)(j) was also satisfied, because there was a reasonable likelihood the children would be harmed if returned to mother's care.

The trial court then moved on to consider the children's best interests. It initially acknowledged, while it was not necessarily opposed to a guardianship, it did "agree that this juvenile guardianship would go on for a long time." The trial court believed it was in the children's best interests to have stability, permanence, and security, and, while the trial court did not "believe for a second that [mother] doesn't love her children and wants to provide that[,]" the trial court was not going to put a guardianship in place if it could not be sure the children would be returned to mother. The children needed permanence, and, therefore, the trial court terminated mother's parental rights.

This appeal followed.

## II. ANALYSIS

Mother argues the trial court erred by determining there was sufficient evidence to support a finding of both the statutory grounds for termination and that termination was in the children's best interests. As noted above and further discussed below, we affirm the trial court's determination that a statutory basis exists for termination, but we reverse and remand for further proceedings on whether termination is in the children's best interests.[4] We retain jurisdiction.

## A. STATUTORY GROUNDS

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). "Only one statutory ground need be established by clear and convincing evidence to terminate a mother's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Clear and convincing evidence:

> [M]ust produce [] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact-finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. [*Hunter v Hunter*, 484

---

[4] We review "for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and . . . the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013).

-6-

Mich 247, 265; 771 NW2d 694 (2009) (quotation marks, footnote, and citation omitted, second and third alterations in original).]

The statutory grounds at issue in this case state:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> * * *

> (c)(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> * * *

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent. [MCL 712A.19b(3)(c)(*i*), (g), (j).]

Regarding MCL 712A.19b(3)(c)(*i*), mother's initial dispositional order was entered in September 2021, regarding LH and EH, and in June 2022, regarding NH. The first termination hearing was held in November 2022, and the continued termination hearing was held in March 2023. Therefore, "182 or more days [had] lapsed since the issuance of an initial dispositional order." MCL 712A.19b(3)(c). The question is therefore whether the conditions leading to the adjudication continued to exist at the time of the termination hearing, and whether there was a reasonable expectation they could be rectified given the children's ages.

When considering MCL 712A.19b(3)(c)(*i*), this Court has previously held termination was proper when "the totality of the evidence amply support[ed] that [the mother] had not accomplished any meaningful change in the conditions" that led to the adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). In this case, the reasons for adjudication provided in the petitions were: (1) lack of supervision resulting in injuries to the children; (2) mother's home being unfit for the children; (3) mother having unstable housing; (4) mother's failure to seek adequate medical treatment for the children, including a substantiated investigation for medical neglect; (5) mother's inability to address the children's needs due to her own cognitive limitations; (6) mother's problematic relationships; (7) mother's lack of cooperation and untruthfulness with Children's Protective Services; and (8) mother having had five substantiated investigations for child abuse or neglect since 2016. At the termination hearing, the trial court focused on mother's housing problems, inability to address her children's medical needs, and failure to properly supervise her children.

-7-

Mother addressed and was making progress on the majority of the conditions that led to the adjudication. Specifically, evidence was presented that mother was actively engaged and knowledgeable regarding all her children's medical concerns and applicable treatments. Mother had not missed a single medical appointment for any of her children and took it upon herself to obtain her own transportation for medical appointments without help from DHHS. The evidence also demonstrated mother fully cooperated with the services provided by DHHS, and that mother had successfully participated in, and completed, every service DHHS required of her. Mother also sought additional services on her own, including supplemental parenting classes, and actively participated in a number of voluntary services. Additionally, testimony indicated mother ended her problematic relationships and was single at the time of the final termination hearing, and mother was on the waitlist for several different apartments which would be suitable for herself and her children.

Nevertheless, mother acknowledged her current housing situation was unsuitable and that she failed to maintain suitable housing, evidenced by her frequent moves during the pendency of the case. She moved at least five times since the adjudication and was living at least part-time at her grandmother's house and part-time with a friend who was not mentioned at all until the final termination hearing, despite needing to show her ability to live independently. More than a year had passed since the children became temporary wards of the state, and mother still lacked stable housing. She was, as noted, on several waiting lists, and testified that when she followed up on her status on the waitlist for one apartment, the management indicated one would be available in June 2023. Unfortunately, there was no evidence mother would, with certainty, be able to obtain an apartment suitable for herself and her children in the near future, and mother herself admitted she may need an additional one or two years to be able to provide suitable housing and care for her children. Mother's inability to maintain housing was a leading factor in the trial court's decision to terminate her parental rights, and there was no reasonable likelihood these conditions would be rectified within a reasonable time considering the children's ages. See *In re Trejo*, 462 Mich 341, 359-360; 612 NW2d 407 (2000).

The trial court also relied on mother's psychological evaluation in its ruling, noting the evaluation's concerns regarding mother's intellectual disability, lack of awareness, distress, and difficulty with social relationships. The trial court referred to mother's problems as "long-term in nature," asserting mother's judgment was "flawed," which would impact her ability to rectify the conditions which led to the adjudication.

We acknowledge mother presented evidence she was benefiting from the services recommended by the evaluation, and that mother was able to provide care for her children despite her diagnoses and risk factors. She presented evidence from an Early-On head-start worker with the Branch Intermediate School District who had been working with mother once a week since 2019. The head-start worker testified mother interacted very well with her children and listened and implemented parenting strategies successfully. The head-start worker was not concerned with mother as a parent, and believed mother's only remaining barrier was inadequate housing. Furthermore, mother's aunt, who served as caretaker for mother's children, did not believe mother's parental rights should be terminated. The aunt expressed no concerns, besides inadequate housing, that mother could take care of her children, going so far as to propose a guardianship until mother could find suitable housing. Finally, a peer support worker testified that mother was consistent with services for the past year and was benefiting from them. However, all three

witnesses admitted mother did not have adequate housing and was unable to provide a stable living situation for her children. The aunt also recognized how mother's problematic relationships impacted her ability to care for her children, and believed mother would need approximately one year to prove she could provide stability for her children.

We must accord significant deference to the findings of the trier of fact. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). When applying the principle that findings of fact may not be set aside unless clearly erroneous, MCR 2.613(C), we must accord deference "to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *Id.* This deference "can make a critical difference in difficult cases[,]" because "the trier of fact has the advantage of being able to consider the demeanor of the witnesses in determining how much weight and credibility to accord their testimony." *In re Miller*, 433 Mich at 337. We recognize this is one of the "difficult cases" highlighting the importance of the deference owed to the trial court under MCR 2.613(C). Mother was making progress, but there were still significant hurdles that had not been addressed, and the trial court did not believe they could be addressed in a reasonable time given the children's ages. The trial court had the advantage of observing and assessing the credibility of the evidence presented by all the witnesses and made its holding on the basis of these observations. Therefore, we conclude the trial court's finding that mother failed to rectify the conditions that led to adjudication, MCL 712A.19b(3)(c)(*i*), was not clearly erroneous.

Because "[o]nly one statutory ground need be established by clear and convincing evidence to terminate a mother's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds[,]" *In re Ellis*, 294 Mich App at 32, we need not address the trial court's findings under MCL 712A.19b(3)(g) and (j).

## B. BEST INTERESTS

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance Minors*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014); MCL 712A.19b(5). "[T]he focus at the best-interest stage has always been on the child, not the parent." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks and citation omitted, alteration in original). "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App at 733. Considerations of the best interests of the child include:

> [T]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks, footnotes, and citations omitted).]

This Court has also considered the length of time that a child was placed in foster care or with relatives and whether it was likely "that the child could be returned to her parents' home within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012).

"The trial court should weigh all the evidence available to determine the child[]'s best interests." *In re White*, 303 Mich App at 713.

In determining the children's best interests, the trial court specifically addressed the possibility of a guardianship, but feared it would "go on for a long time[,]" noting mother's eldest child was already in a guardianship, and there were complaints by the guardian that mother's involvement was inconsistent. The trial court reasoned there was no question mother loves her children, but a guardianship would require review hearings for years, and mother would be unable to provide the stability, permanence, and security the children deserved. The court also noted that, to the degree mother had made progress, it did not alleviate these concerns, because she had significant assistance from not only the various services provided by DHHS and community agencies, but also the assistance of the children's current placement and various other family members. These facts alone are not sufficient for us to assess whether termination is in the children's best interests.

The crux of the trial court's decision to find it was in the best interest of the children to terminate mother's parental rights related to permanency. Addressing the best-interest factors, the trial court explained that the court contemplated a guardianship but feared that the guardianship "would go on for a long time." The trial court further explained,

> I believe it's in the best interest of all these children to have stability, permanence, and security. And again, I don't believe for a second that [mother] doesn't love her children and wants to provide that. I just don't see, like, long-term foster care as being an option here. And I'm cognizant of the fact that we have a family placement, and I'm cautiously optimistic maybe that will turn into an adoptive placement.

> I would put in place a guardianship if I thought that at some point these children would be back to the care of the mother, but I'm not convinced that they can. I just think that she would certainly be overwhelmed by these three children. I mean, it's unfortunate, but at this point in time I do find in the interest of what would be security of these children's permanence, which is really the issue here, and also safety, that mother's rights should be terminated. So, I'm going to do that at this time.

> And again, this isn't something I really want to do. I debated the guardianship, but I don't think that that would be an answer. I just think we would be reviewing this thing year, after year, after year and there wouldn't be sufficient change for these children to be returned to mother's care.

The trial court found termination to be in the children's best interests because mother would not be able to provide stability and permanency for the children within a reasonable amount of time. As previously acknowledged, mother has an intellectual disability, and thus it is demonstrably more difficult for her to independently parent the children than it might be for an able-bodied parent. The trial court did not specifically touch on the matter of mother's intellectual disability when ruling on best-interests, but ample evidence was presented in the record to paint a picture of how it affects mother's life, interpersonal relationships, and ability to parent. Thus, it can be

inferred that the trial court took mother's intellectual disability into consideration. However, it is our opinion that the trial court did not adequately consider that mother's intellectual disability means that she will need more time and more resources than the average person in order to overcome the conditions that led DHHS to file its petition for termination.

A similar situation came before our Supreme Court in *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017). There, the mother had an intellectual disability; her rights were terminated after she failed to adhere to a standard case service plan. *Id*. at 83-84. This Court "concluded that because 'the case service plan never included reasonable accommodations to provide mother a meaningful opportunity to benefit,' the Department had 'failed in its statutory duty to make reasonable efforts to reunify the family unit.' " *Id*. at 85, quoting *In re Hicks*, 315 Mich App 251, 269-271; 890 NW2d 696 (2016). Our Supreme Court agreed, holding that DHHS failed to make reasonable efforts to provide reunification services tailored to the mother's intellectual disability. *In re Hicks/Brown*, 500 Mich at 90.

Moreover, the record is devoid of actual permanency plans for the minor children. Would the caretaking aunt adopt them, thus allowing for them to continue to have a relationship with their mother? Would strangers adopt them, effectively severing all ties with mother? Would the children be kept together? Would they be separated? In other words, what are the intended post-termination plans for these children? Answers to these questions would be useful for all involved at the trial court level, and would enable this Court to determine whether the trial court's decision to terminate mother's parental rights is in the best interests of these minor children.

III. CONCLUSION

Affirmed in part, reversed in part and remanded for additional proceedings to be commenced within 35 days of this opinion. We retain jurisdiction.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro
/s/ Christopher P. Yates

# Court of Appeals, State of Michigan

# ORDER

In re Hogan, Minors.

Docket No.    365923

LC No.        21-006247-NA

Michelle M. Rick
Presiding Judge

Douglas B. Shapiro

Christopher P. Yates
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court.  We retain jurisdiction.

Proceedings on remand in this matter shall commence within 35 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, this matter is remanded for further proceedings.  On remand, the trial court shall reconsider whether termination is in the children's best interests, and shall expressly reconsider placing the children under guardianship.  The proceedings on remand are limited to these issues.

The parties shall promptly file with this Court a copy of all papers filed on remand.  Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

_December 21, 2023_
Date

_____
Chief Clerk